**Rex BARBER, Plaintiff–Appellant,**

v.

**Sheila WIDNALL,\* Secretary of the Air Force, Defendant–Appellee.**

No. 93–36200.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 9, 1995.

Withdrawn from Submission June 13, 1995.

Resubmitted Feb. 6, 1996.

Decided March 14, 1996.

---

\* Sheila Widnall is substituted for Mike Donley, former Acting Secretary of the United States Air Force, pursuant to Fed.R.App.P. 43(c)(1).

Dan R. Hyatt, Portland, Oregon, for plaintiff-appellant.

William W. Youngman, Assistant United States Attorney, Portland, Oregon, for defendant-appellee.

Before: HUG, Chief Judge, CANBY, and REINHARDT, Circuit Judges.**

CANBY, Circuit Judge:

This case arises from one of the remarkable events in the Pacific theater of World War II—the long range fighter mission that culminated in the death of Admiral Isoroku Yamamoto, the architect of the attack on Pearl Harbor. In this appeal, Rex Barber, a retired Air Force pilot, challenges the denial by the Secretary of the Air Force of his petition to correct his military record pursuant to 10 U.S.C. § 1552, to reflect his sole credit for having shot down Yamamoto's bomber. Barber appeals the district court's summary judgment in favor of the Secretary. We conclude that the Secretary's decision was not contrary to law, arbitrary or capricious, and was supported by substantial evidence. We therefore affirm the judgment of the district court.

** Judge Tang was originally a member of this panel and heard argument in this case. He died prior to circulation of this opinion, and pursuant to General Order 3.2(g), Judge Hug was drawn

## BACKGROUND

Two years after the bombing of Pearl Harbor, the United States Navy intercepted and decoded a message indicating that Admiral Yamamoto would be flying to Bougainville Island to inspect Japanese troops. The United States planned a secret mission to shoot down Admiral Yamamoto's airplane, sending fifteen P–38's from Guadalcanal to intercept the bomber on April 18, 1943. Barber, Besby Holmes, and Tom Lanphier were among those flying on that historic mission.

The mission was spectacularly successful. The post-flight report originally states that two Mitsubishi "Betty" bombers were sighted, with fighter escort, but its description of the action includes three bombers. The report indicated that Barber shot and hit two bombers that went down; one crashed on land and the other, which was also hit by Holmes, crashed into the sea. The report also indicated that Lanphier shot down a bomber that crashed on land. The bomber that crashed into the sea did not carry Yamamoto. According to the report:

> When Lanphier and Barber were within one mile of [the bombers], their attack was observed by the enemy. The bombers nosed down, one started an 360 tunr [sic] dive, the other going out and away toward the shoreline; the [Japanese] Zeros dropped their belly tanks and three peeled down, in a string to intercept Lanphier. When he saw that he could not reach the bomber he turned up and into the Zeros, exploding the first, and firing into the others as they passed. By this time he had reached 6000 feet, so he nosed over, and went down to the tree tops after his escaping objective. He came into it broadside-fired his bursts-a wing flew off and the plane went flaming to earth.

· · · · ·

Barber had gone in with Lanphier on the initial attack. He went for one of the bombers but its maneuvers caused him to overshoot a little. He whipped back, how-

as a replacement. Judge Hug was provided with a tape of the oral argument as well as the briefs and other materials received by the other members of the panel.

ever, and although pursued by Zeros, caught the bomber and destroyed it. When he fired, the tail section flew off, the bomber turned over on its back and plummetted [sic] to earth.

.        .        .        .        .

... Holmes noticed a stray bomber near Moila Point flying low over the water. He dove on it, his bursts setting it smoking in the left engine; hine [sic] also shot at it and Barber polished it off with a burst in the fuselage.

Although no official kill credits were given immediately after the mission because of its secrecy, the Navy unofficially kept data cards, based on Lanphier's and Barber's reports, indicating that each had earned one full "kill" credit for shooting down a bomber; Barber also had a half-kill credit for shooting down a third bomber with Holmes. After the war ended, Lanphier and Barber each claimed credit for shooting down Admiral Yamamoto's bomber.

In the 1950's, however, Japanese records confirmed that only two bombers, rather than three, had been shot down. Because Barber and Holmes destroyed one bomber together, Barber and Lanphier could not have each shot down a bomber by themselves. It was Barber's view that Lanphier had not shot a bomber.

In 1957, the Air Force directed the Historical Division to verify and publish aerial victory credits for World War II. When the Air Force Historical Research Center (USAFHRC), formerly the Historical Division, finally published its aerial victory credit report for World War II in 1978, the report credited Lanphier and Barber jointly with shooting down Yamamoto's bomber. The pilots thus shared one official victory credit, depriving each of one-half of the full credit previously assigned.

After the publication of the 1978 report, Barber embarked on a lengthy attempt to overturn the findings of the USAFHRC and to be given sole credit for downing Yamamoto's bomber. His efforts eventually prompted the Chief of Air Force History to convene an unofficial "Victory Credit Board of Review" to reconsider the evidence in 1985 (hereafter "the 1985 Board").[1] The 1985 Board examined evidence from numerous sources indicating that Barber had first shot at Yamamoto's bomber, setting it afire and causing a portion of the tail to fly off, and that Lanphier subsequently had struck the disabled bomber, causing it to plummet to earth. The Board report noted that

> *any speculation* about the ability of Admiral Yamamoto's crippled bomber to continue another ten minutes in flight just above the jungle to its destination on Ballale, if Lanphier had not attacked, had no bearing whatsoever on these deliberations and must remain always—speculation.

The 1985 Board thus concluded that credit was properly shared, as both Barber's and Lanphier's fire had contributed to the destruction of Yamamoto's bomber.

Colonel Lanphier died in 1987. Following his death, the "Second Yamamoto Mission Association" (SYMA) was formed to advance Barber's cause. At the request of SYMA, in March 1990 the Historical Research Center convened an Independent Advisory Panel of combat pilots to review new evidence in support of Barber's claim to sole credit for downing Admiral Yamamoto's airplane. The Panel affirmed that the evidence did not warrant a change in the assignment of victory credit, and that shared credit remained appropriate.

Continuing his quest to receive the sole credit for downing Yamamoto, Barber filed a petition to change his military record with the Secretary of the Air Force pursuant to 10 U.S.C. § 1552.[2] In September of 1991, the

---

1. Barber attests that he was never informed of this event. Any lack of information on Barber's part is unlikely to have affected the outcome, however, because the Board excluded the personal recollections of participants from consideration due to the passage of time.

2. Section 1552 provides, in relevant part, that "[t]he Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice.... [S]uch corrections shall be made by the Secretary acting through boards of civilians...." 10 U.S.C. § 1552(a)(1).

Air Force History Office separately issued an advisory opinion concluding that "enough uncertainty exists about what actually happened during this engagement to warrant accepting both Barber's and Lanphier's claims" and recommending that Barber's petition be denied.

Pursuant to 10 U.S.C. § 1552(a)(1), the Air Force Board for Correction of Military Records (AFBCMR), comprised of five civilian members, undertook extensive hearings and review of the evidence in order to make a recommendation to the Secretary regarding Barber's petition. The AFBCMR met and discussed the application on four occasions, but failed to reach a majority opinion. The Board's report explained that

> The passage of almost fifty years, the frailties of human memory, the strength of opposing views, and the absence of a key participant made it not only difficult, but in the end, impossible to reach a majority position.

Two AFBCMR members voted to deny Barber's petition, finding that the available evidence indicated that credit ought to continue to be shared because Barber had not provided substantial evidence of error or injustice in the decision to credit both pilots. Two AFBCMR members recommended that the Secretary grant Barber's petition for sole credit, and alternatively supported submission of the documentation to a reconvened Victory Credit Board for reconsideration if the Secretary did not adopt their recommendation. The fifth AFBCMR member was persuaded toward Barber's view of the events, but believed that the appropriate course of action would be for the Secretary to convene a new Victory Credit Review Board to render a final decision. This fifth member also felt that the absence of Lanphier at the AFBCMR's hearing created an inequity.

The AFBCMR, with no consensus reached but with three members recommending referral to a new Victory Credit Board, forwarded its report to the Secretary. The Secretary carefully reviewed the extensive record compiled by the AFBCMR and was "not convinced that the award of shared credit for the Yamamoto shootdown [was] either in error or unjust." The Secretary accordingly denied Barber's petition for correction of his military record.

Barber then filed this action in the district court, seeking review of the Secretary's decision under the Administrative Procedure Act, 5 U.S.C. § 702. Barber sought an order directing the Secretary to restore Barber's full credit for shooting down the bomber. The magistrate judge granted the Secretary's motion for summary judgment after finding that the denial of Barber's petition was not arbitrary or capricious and was supported by substantial evidence. *Barber v. Donley*, No. 93–478–JE, at 15–17 (D.Or. Nov. 30, 1993). Barber appeals this decision of the district court.

## JUSTICIABILITY

As a preliminary matter we address the question whether this case is justiciable, or, as the Secretary argues, is a nonjusticiable dispute involving internal military decision-making. We may consider the issue of justiciability at any time because it is a prudential aspect of the "case and controversy" prerequisite for federal court jurisdiction. *See Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

We conclude that the case is justiciable. Barber contends that his military record is incorrect, and 10 U.S.C. § 1552 has been enacted for the correction of erroneous records. Barber contends that the Secretary has violated section 1552 in denying his petition, and he has exhausted his intraservice remedies more thoroughly than we have ever seen. His claim therefore meets the threshold requirements for judicial review of a military decision under the *Mindes* [3] doctrine, as adopted and modified in this Circuit. *See Sebra v. Neville,* 801 F.2d 1135, 1141 (9th Cir.1986).

The prudential considerations set forth in our Circuit's version of the *Mindes* doctrine also favor Barber. First, Barber has a strong interest in having his military record

3. *Mindes v. Seaman,* 453 F.2d 197, 201–02 (5th Cir.1971).

accurately reflect his participation in an event of deep personal and historic significance. *See Sebra*, 801 F.2d at 1141. Second, Barber's potential injury if review is denied, while neither economic nor physical, is not insignificant. *See id.* Third, and perhaps most important, judicial review will not interfere with military functions or discipline. *See id.* Fourth, review of the Secretary's decision for arbitrariness and support in the evidence does not require military expertise. *See id.* We have previously found decisions of the Secretary or AFBCMR under § 1552 reviewable in accordance with the Administrative Procedure Act. *See, e.g., Guerrero v. Stone*, 970 F.2d 626, 628 (9th Cir.1992).

We conclude, therefore, that Barber's appeal presents a justiciable controversy.

### THE SECRETARY'S DECISION

■ We review *de novo* the district court's grant of summary judgment; we thus determine for ourselves whether the Secretary's decision to deny Barber's section 1552 relief was "arbitrary, capricious, or not based on substantial evidence." *Chappell v. Wallace*, 462 U.S. 296, 303, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983). We emphasize the limited role this court plays in reviewing the ruling of the Secretary. Our function is not to determine who shot down Yamamoto's bomber, but only to review the Secretary's decision to ensure that it complied with the law, was rational, and was based on substantial evidence. "Substantial evidence means more than a scintilla and is such that a reasonable mind may accept it as adequate to support a conclusion." *Travers v. Shalala*, 20 F.3d 993, 996 (9th Cir.1994).

The Secretary followed the procedures prescribed by law. Section 1552 leaves much room for discretion, for it provides that the Secretary "*may* correct any military record ... when the Secretary considers it necessary to correct an error or remove an injustice." (Emphasis added). In making such corrections, the Secretary must act through a board of civilians, the AFBCMR, under procedures established by the Secretary and approved by the Secretary of Defense.

Under those procedures, when the Board grants an application for relief in whole or part, and the decision of the Board is not unanimous, the Board is required to "send the record of proceedings ... to the Secretary of the Air Force or his or her designee for final decision." Air Force Regulation ("AFR") 31–3, § D(23)(b)(3) (1992). The Secretary's authority in making such a decision is broad. AFR 31–3, § D(24) provides:

> [T]he Secretary of the Air Force may direct such action as he or she determines to be appropriate, which may include returning a case to the Board for further consideration.... If the Secretary does not accept the Board's recommendation, the decision will be in writing and will include a brief statement of the grounds for denial.

Section 1552 and AFR 31–3 together thus permit the Secretary to reject the recommendation of the Board when the Secretary determines that allowing a military record to stand, or failing to convene yet another Board to review the evidence, is not necessary to "correct an error or remove an injustice."

In reaching the decision to deny Barber's petition, the Secretary (then Donald B. Rice) carefully reviewed the extensive record compiled by the AFBCMR and considered the Board members' recommendations. He also gave considerable weight to all of the previous reviews by various Boards that had examined the evidence. The Secretary concluded that he was "not convinced that the award of shared credit for the Yamamoto shootdown [was] either in error or unjust."

The Secretary listed, *inter alia*, five points which were "critical to [his] deliberations:"

> First, the magnificent accomplishments of Colonel Barber remain undiminished. His contributions to World War II have inspired a generation, and will inspire all who follow in his footsteps. For their sake, it would be desirable to bring to a close the continuing debate surrounding this case. I share the Board's view that such debate is not an appropriate memorial to heroes.

> Second, the evidence concerning Lieutenant Colonel Lanphier's part in this mission remains equivocal; but there is sub-

stantial evidence that he did fire upon and hit Admiral Yamamoto's aircraft.

Third, contemporaneous combat records and the later decisions of the Victory Credit Board and the Victory Credit Review Board are entitled to considerable weight, especially after the passage of half a century.

Fourth, we no longer have the opportunity to hear Lieutenant Colonel Lanphier's recollections. Although we have his writings, he is no longer here to make his case.

A final, overarching, point is the role of teamwork in the Yamamoto mission. The entire operation was a triumph of intelligence and airmanship in terms of planning and execution. Glory should go to the team.

The Secretary's decision evidences careful consideration of the long and disputed factual history of the case. His view of the facts is supported by substantial evidence. While much of the evidence before the Board was consistent with Barber's having shot Yamamoto's bomber down without assistance, there was other evidence, including an interview with a Japanese survivor many years after the fact, that was consistent with two P-38's having hit the bomber. After reviewing the conflicting accounts of the events of April 18, 1943, and the impossibility of definitively determining whether one pilot or both were responsible for downing Yamamoto's bomber, the Secretary found that justice was best served by allowing the award of shared credit to stand. The Secretary's determination that another result was not "necessary" to correct an error or an injustice was rational and not arbitrary or capricious.

The Secretary's implicit determination that it would be futile to convene another Victory Credit Review Board was also based on substantial evidence of irreconcilable conflict in the numerous sources recounting the mission. As the Board report stated, the divergent votes of its members were "an accurate representation of the strongly held and conflicting views as to what really happened and the difficulty of even objective and reasoning people to agree almost 50 years later." The Secretary noted that "historians, fighter pilots, and all of us who have studied the

record of this extraordinary mission will forever speculate as to the exact events of that day in 1943." The decision against convening yet another review board was rational in light of the substantial evidence evincing the impossibility of further clarifying the relevant facts.

■ Barber also argues that the Secretary acted contrary to law in failing to apply the "confirmation rule," which, according to Barber, requires that an aerial victory be confirmed by another eyewitness or gun camera film in order for credit to be given. As the magistrate judge observed, there is no indication that the informal guidelines often used by the Air Force Historical Research Center for crediting kills have achieved the status of "law." The "confirmation rule" is not an official prerequisite to awarding victory credits. We thus find that the Secretary's actions were not contrary to law.

In conclusion, we hold that the Secretary of the Air Force acted within the range of discretion allowed under 10 U.S.C. § 1552. His decision was not arbitrary or capricious, and was based on evidence adequate to support the conclusion that the aerial victory credit should continue to be shared between Lanphier and Barber. While this determination is unlikely to satisfy Barber's desire for sole recognition for the downing of Yamamoto's bomber, it is the necessary result in this limited legal proceeding under the applicable standard of review. We do not express an opinion as to which pilot, if indeed only one pilot, was responsible for shooting down Yamamoto. As the magistrate judge aptly observed, "[t]he final words on this issue will be written by historians, not by judges." No. 93-478-JE, at 16 (D.Or. Nov. 30, 1993) (internal footnote omitted). We agree that the time has come to lay this controversy to rest in the courtroom, if not in the annals of history.