Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 11, 2010　　　　　Decided March 26, 2010

No. 09-5099

PRIME TIME INTERNATIONAL COMPANY,
FORMERLY KNOWN AS SINGLE STICK, INC.,
APPELLANT

v.

THOMAS J. VILSACK, SECRETARY OF AGRICULTURE AND
UNITED STATES DEPARTMENT OF AGRICULTURE,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-01077)

———

*Reed Rubinstein* and *Mark Solomons* argued the cause and filed the briefs for appellant.

*Sydney A. Foster*, Attorney, U.S. Department of Justice, argued the cause for appellee.  With her on the brief were *Mark B. Stern*, Attorney.  *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In 2004 Congress enacted the Fair and Equitable Tobacco Reform Act ("FETRA"), 7 U.S.C. § 518 *et seq.*, repealing a system of quotas and price supports for tobacco production and providing for payments for ten years to producers and persons who had established marketing quotas to ease the transition. These payments are funded by quarterly assessments on manufacturers and importers of tobacco products. Prime Time International Company, a manufacturer of small cigars, challenged its assessments for three quarters of FY 2005, asserting claims under FETRA, the Information Quality Act, 44 U.S.C. § 3516 note, and the Due Process Clause of the Constitution. The district court granted summary judgment to the Secretary and Department of Agriculture on the FETRA and due process claims, and dismissed the IQA claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Our review is *de novo*, and we affirm in part and reverse in part.

**I.**

Upon "repeal[ing] all aspects of the Federal tobacco support program," H.R. REP. NO. 108-755, at 440 (2004) (Conf. Rep.), *reprinted in* 2004 U.S.C.C.A.N. 1341, 1518, Congress established a ten-year transitional program under which the United States Department of Agriculture ("USDA") continues to make payments to farmers formerly covered by marketing quotas. 7 U.S.C. § 518e. The payments come from a newly established Tobacco Trust Fund in the Commodity Credit Corporation at USDA. *Id.* § 518e(a). The Trust Fund is supported by quarterly assessments on tobacco manufacturers

and importers. *Id.* § 518d(b). Under FETRA, assessments are to be allocated among manufacturers and importers of six types of tobacco: cigarettes, cigars, snuff, roll-your-own, chewing, and pipe. *Id.* § 518d(c). The allocation within each class of tobacco product "shall be . . . on a pro rata basis . . . based on each manufacturer's or importer's share of gross domestic volume," with "[n]o manufacturer or importer . . . required to pay an assessment that is based on a share that is in excess of [its] share of domestic volume." *Id.* § 518d(e)(1), (2). An individual manufacturer's or importer's assessment within a class of tobacco product is determined by multiplying its market share of the tobacco class by the total amount of the assessment for the tobacco class. *Id*. § 518d(f). "Market share" is defined as "the share of each manufacturer or importer of a class of tobacco product . . . of the total volume of domestic sales of the class of tobacco product during the base period for a fiscal year for an assessment . . . ." *Id*. § 518d(a)(3).

Congress set the class allocations for FY 2005, *see id.* § 518d(c)(1), while authorizing the Secretary of Agriculture to adjust the allocations in subsequent years "to reflect changes in the share of gross domestic volume held by that class of tobacco product," *id.* § 518d(c)(2). Gross domestic volume is defined as "the volume of tobacco products removed (as defined by section 5702 of Title 26)" and "not exempt from tax under chapter 52 of Title 26 at the time of their removal under that chapter or the Harmonized Tariff Schedule of the United States," neither of which is germane.[1] *Id.* § 518d(a)(2). "[R]emoved," as used by

---

[1] Chapter 52 exempts from taxation several classes of tobacco, including: "Tobacco products furnished for employee use or experimental purposes"; "Tobacco products and cigarette papers and tubes transferred or removed in bond from domestic factories and export warehouses"; "Tobacco products and cigarette papers and tubes released in bond from customs custody"; and "Tobacco products and

FETRA, means "the removal of tobacco products or cigarette papers or tubes, or any processed tobacco, from the factory . . . or release from customs custody." 26 U.S.C. § 5702(j).[2] A manufacturer or importer may appeal its assessment to the Secretary, using "any information that is available, including third party data on industry or individual company sales volumes," and the Secretary "must make any revisions necessary to ensure that each manufacturer and importer pays only its correct pro rata share of total gross domestic volume from all sources." *Id.* § 518d(i)(2), (i)(4)(B).

As interpreted by USDA, FETRA creates a two-step process for determining the amount of each manufacturer's or importer's quarterly assessment. First, assessments are allocated among six classes of tobacco. *Id.* § 518d(c); 7 C.F.R. § 1463.5. For FY 2005, Congress apportioned 2.783% of the total assessment to

---

cigarette papers and tubes exported and returned." 26 U.S.C. § 5704. "The Harmonized Tariff Schedule of the United States . . . is maintained and published periodically by the United States International Trade Commission." 19 U.S.C. § 1202; *see* Chapter 24, Tobacco & Manufactured Tobacco Substitutes (2010), *available at* http://www.usitc.gov/publications/docs/tata/hts/bychapter/1000C24. pdf.

[2] "Removal" or "remove" is defined as:

> the removal of tobacco products or cigarette papers or tubes, or any processed tobacco, *from the factory* or from internal revenue bond under section 5704, as the Secretary shall by regulation prescribe, or *release from customs custody*, and shall also include the smuggling or other unlawful importation of such articles into the United States.

26 U.S.C. § 5702(j) (emphasis added).

the cigar class. 7 U.S.C. § 518d(c)(1)(B). Second, USDA allocates each class's share among individual manufacturers and importers based on market share, which turns on the "volume of domestic sales." *See id.* § 518d(f), (a)(3). For cigarette and cigar companies, the "volume of domestic sales" is, according to USDA, determined solely by the number of cigarettes and cigars, without differentiating between large and small cigars. USDA relies on section 518d(g)(3)(A), which provides that "the volumes of domestic sales shall be measured by — in the case of cigarettes and cigars, the number of cigarettes and cigars." *See also* 7 C.F.R. § 1463.7(b)(1). For "other classes of tobacco products," the measurement of the "volumes of domestic sales" shall be "in terms of number of pounds, or fraction thereof, of those products." 7 U.S.C. § 518d(g)(3)(B); *see also* 7 C.F.R. § 1463.7(b)(2). USDA obtains the data needed for these calculations from copies of tax and customs forms (listing the number of cigarettes and cigars and numbers of pounds of other tobacco products "removed" into domestic commerce) that are filed with the Treasury Department and the Department of Homeland Security and submitted to USDA by manufacturers and importers. *See* 7 U.S.C. § 518d(h)(1), (2); 7 C.F.R. § 1463.7(b).

Prime Time is a manufacturer of "small" cigars, which weigh less than three pounds per thousand cigars. *Cf.* 26 U.S.C. § 5701(a)(1) (defining "small cigars"). For FY 2005, USDA initially assessed Prime Time $339,719 for the first quarter based on a market share for the cigar class of 4.81%; $455,374 for the second quarter based on a market share of 6.45%; and $1,152,530 for the third quarter based on a market share of 7.78%. Prime Time filed an administrative appeal of its assessments to the Secretary pursuant to 7 U.S.C. § 518d(i), arguing that USDA's per-stick approach improperly treated differently sized cigars similarly and submitted verifiable A.C. Nielsen sales data as an alternative source for calculating its

market share. The Secretary, acting through the Deputy Administrator for Farm Programs, acknowledged that Prime Time's objection to the inequity of assessing large and small cigars equally was "philosophically well founded," but took the position that the per-stick method was mandated by section 518d(g)(3)(A) of FETRA. *Letter Decision* of Feb. 8, 2006 at 4. The Secretary also took the position that A.C. Nielsen data, which measures across-the-counter sales of tobacco products, did not conform to the requirement that market share calculations be based on the amount of product "removed." *See id*. at 6. The Secretary agreed, however, that Prime Time correctly challenged both the exclusion of non-reporting manufacturers and importers in apportioning assessments and the inclusion of certain expenses in calculating assessments under the transition payment program. The Secretary rejected Prime Time's claim that it was entitled as a matter of due process to examine the industry-wide tax and customs data used by USDA to calculate the assessments on the ground that such information about other companies was made confidential by statute, *see* 26 U.S.C. § 6103. As subsequently revised, Prime Time's FY 2005 assessments for the first, second, and third quarters were $351,007.23, $472,017.47, and $1,135,353.46, respectively.

Prime Time petitioned for review in the district court pursuant to 7 U.S.C. § 518d(j). The district court granted summary judgment for the Secretary and USDA. *Single Stick, Inc. v. Johanns*, 601 F. Supp. 2d 307 (D.D.C. 2009). The district court deferred to USDA's interpretation of FETRA that the per-stick method of determining market share was statutorily mandated as not contrary to congressional intent and a permissible interpretation of the statute under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Single Stick*, 601 F. Supp. 2d at 314. It rejected Prime Time's due process claim regarding access to the data underlying the Secretary's assessments because Prime Time failed to

demonstrate prejudice. *Id.* at 315. Finally, it dismissed Prime Time's claim that USDA's failure to respond to requests for disclosure and "correction" of the data underlying the assessments violated the Information Quality Act ("IQA"), 44 U.S.C. § 3516 note, ruling that the IQA did not vest any party with the right to disclosure and correction and that USDA's failure to respond did not constitute final agency action subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 704. *Single Stick*, 601 F. Supp. 2d at 316–17. Prime Time appeals, and this court's review is *de novo*, "as if the agency's decision had been appealed to this court directly." *Gerber v. Norton*, 294 F.3d 173, 178 (D.C. Cir. 2002) (internal quotation marks omitted).

## II.

Prime Time contends that USDA's interpretation of the Fair and Equitable Tobacco Reform Act is contrary to ordinary construction and plain meaning of the word "volume" in the phrase "gross domestic volume," which is defined in section 518d(a)(2) as the "volume of tobacco products — removed (as defined by section 5702 of Title 26)" and "not exempt from tax" pursuant to provisions not relevant to this appeal, *supra* note 1. It observes that where statutory terms, such as "volume" here, are not defined in a statute, courts give them their ordinary meaning, citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). USDA responds that "volume" is "clearly explained" in FETRA to mean the number of cigars because section 518d(g)(3) provides that the number of cigars determines the "volume of domestic sales" and thus "market share" under section 518d(f).

Prime Time replies that under USDA's elastic construction it has calculated the cigar class's share of gross domestic volume at step one by separately calculating the excise tax paid on large

and small cigars and then adding the two amounts. *See* 70 Fed. Reg. 7007, 7008 (Table 1) (Feb. 10, 2005). But then, at step two, USDA calculates the market shares for individual manufacturers and importers based on their share of the "commingled number of large and small cigars." Reply Br. 5. This skips a necessary step, Prime Time maintains, because FETRA requires that the allocation within a tobacco class be "on a pro rata basis" with "[n]o manufacturer or importer . . . required to pay an assessment that is based on a share that is in excess of the manufacturer's or importer's share of domestic volume." 7 U.S.C. § 518d(e). Therefore, it argues, after allocating the assessment by class of tobacco products, USDA should divide the cigar class assessment into sub-classes of large and small cigars, with the relative allocation determined by total weight, and then divide the assessments among individual large and small cigar manufacturers and importers on a per-stick basis from the sub-divided assessments, satisfying subsection (g)(3)(A). Prime Time contends such a method is required by the plain text of subsection (e) as well as subsection (i)(4)(B), which, upon administrative appeal, requires the Secretary to "make any revisions necessary to ensure that each manufacturer and importer pays only its correct pro rata share of total gross domestic volume from all sources."

In interpreting a statute, the court begins with the text, and employs "traditional tools of statutory construction" to determine whether Congress has spoken directly to the issue. *See Chevron*, 467 U.S. at 842–43 & n.9. If so, the court's task is at an end. *See id.* at 842–43. USDA construes section 518d(g)(3)(A) of FETRA to mandate the per-stick method for apportioning assessments among individual manufacturers and importers within the cigarette and cigar class without first sub-dividing the cigar class into large and small cigars. In its view "[t]he statute could hardly be more explicit." Appellees' Br. 15. It suggests *Swisher Int'l Inc. v. Schafer*, 550 F.3d 1046 (11th Cir. 2008),

*cert. denied*, 130 S. Ct. 71 (2009), supports this interpretation. However, *Swisher* provides no analysis, stating only that "[f]or cigarette and cigar sellers, the individual assessments are determined by the number of cigarettes and cigars sold," while for other tobacco classes, the number of pounds of tobacco is used. *Id*. at 1050.

The plain text of FETRA does not self-evidently vindicate USDA's two step assessment method. Under FETRA, the "volume of domestic sales" and "market share" are not synonymous with "gross domestic volume." FETRA provides, for example, that "[t]he volume of domestic sales shall be calculated *based on* gross domestic volume," 7 U.S.C. § 518d(g)(2) (emphasis added), indicating two different meanings for the terms. And section 518d(g)(3)(A) does not, on its face, require that a compound number of large and small cigars serve as the denominator when calculating a manufacturer's or importer's volume of domestic sales on a per-stick basis. Most critically, USDA's interpretation appears to ignore the pro-rata-basis limitation Congress imposed on assessments within a tobacco class in subsection (e). As interpreted by USDA, it is irrelevant that one large cigar consumes far more tobacco than a small cigar, and so accounts for a far larger segment of the market than its per-stick contribution would indicate. Yet the text and structure of the statute titled the Fair and Equitable Tobacco Reform Act suggests an easy counting metric for cigarettes and cigars may not override a statutory mandate that assessments be "allocated on a pro rata basis" within each class of tobacco product, *id.* § 518d(e)(1). Prime Time's interpretation suggests that there is at least one way to interpret FETRA's provisions consistently and in harmony, with none made superfluous or insignificant. *See Corley v. United States*, 129 S. Ct. 1558, 1566 (2009); *City of Anaheim, Cal. v. FERC*, 558 F.3d 521, 522 (D.C. Cir. 2009).

For the purpose of this appeal, the court need only observe that USDA's present interpretation is not mandated by the plain text of FETRA. USDA does not maintain that its interpretation of FETRA is a permissible view of an ambiguous statute entitled to deference under *Chevron* step 2, 467 U.S. at 843. Given that FETRA does not appear to be susceptible of only a single interpretation, we reverse and remand to the district court with instructions to remand Prime Time's FETRA claims to the USDA for further proceedings. *See PDK Labs. Inc. v. U.S. DEA*, 362 F.3d 786, 797–98 (D.C. Cir. 2004).

To the extent Prime Time contends USDA arbitrarily and capriciously overestimated its market share by relying on inaccurate data, USDA adequately explained why it rejected Prime Time's view that A.C. Nielsen data on industry and individual sales volumes should be used in lieu of "removal" data.[3] Section 518d(g)(1) directs USDA to calculate the volume of domestic sales and thus market share using "removal" forms and tax returns "as well as any other relevant information provided to or obtained by the Secretary." Section 518d(i)(2) also permits manufacturers and importers to use data on "individual company sales volumes" to challenge their assessments. While these provisions do not require USDA to accept such non-"removal" data or change an assessment based on it, USDA would be advised on remand to offer an explanation in response to Prime Time's argument that the discrepancy in results indicated USDA's data and calculations were inaccurate. For the relevant period, the A.C. Nielsen data showed Prime Time's market share was between 1.05% and 2.5% as compared to between 4.81% and 7.78% computed by USDA. In ruling on

---

[3] Prime Time's objection to increases in its market share following its administrative appeal, which is not part of the USDA record before the court, is subsumed in our remand; we thus expect its objection will be addressed on remand should the issue arise.

Prime Time's administrative appeal, the Secretary pointed out that A.C. Nielsen data "is across-the-counter 'sales' data," tracking the number of cigars sold at the point of sale, while under FETRA "[m]arket shares . . . are computed based on tobacco product 'removal' data." *Letter Decision* at 6; *see* 7 U.S.C. § 518d(a)(3),(g)(2),(a)(2). Because FETRA adopted the definition of "removal" in 26 U.S.C. § 5702, *supra* note 2, the Secretary concluded USDA had to rely on excise tax and customs forms that report data on "removal." By contrast, because A.C. Nielsen's over-the-counter sales data does not track "removal," it "[is] not (and will not be) synonymous" with "removal" data. *Letter Decision* at 6. USDA was not required to provide more of an explanation for rejecting Prime Time's suggestion it use A.C. Nielsen data instead of "removal" data. *See Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001). Still, the discrepancy is troubling and inasmuch as the Secretary's explanation was based on his view that section 518d(g)(3)(A) was dispositive, we leave open the question whether, upon remand, A.C. Nielsen data may assume significance should Prime Time renew its argument.

We do not address Prime Time's contention that its due process rights were violated when USDA refused to disclose the tax and customs data underlying its FETRA assessments. On appeal USDA advises that, with Treasury Department agreement, certain previously unavailable industry-wide data sought by Prime Time can now be disclosed without running afoul of the tax confidentiality statute, 26 U.S.C. § 6103. *See* Appellees' Br. 34; 7 C.F.R. § 1463.8(b)(8). Any due process challenge would therefore arise in a different context upon remand.

**III.**

The Information Quality Act of 2000 provides that the Director of the Office of Management and Budget ("OMB") shall, "with public and Federal agency involvement," issue guidelines by the end of September 2001 that:

> provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the purposes and provisions of chapter 35 of title 44, United States Code, commonly referred to as the Paperwork Reduction Act.

44 U.S.C. § 3516 note (a). The guidelines "apply to the sharing by Federal agencies of, and access to, information disseminated by Federal agencies," and require such agencies to "issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information . . . disseminated by the agency." *Id.* § 3516 note (b)(1), (2)(A). Each such Federal agency shall, under the guidelines, "establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under" the IQA. *Id.* § 3516 note (b)(2)(B).[4]

The OMB Guidelines define "dissemination" as "agency initiated or sponsored distribution of information to the public."[5]

---

[4] The USDA's IQA guidelines are available at www.ocio.usda.gov/qi_guide/.

[5] *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by*

67 Fed. Reg. at 8460. The definition excludes "distribution limited to . . . adjudicative processes." *Id*. On appeal, USDA points to the preamble to OMB's Guidelines:

> The exemption from the definition of "dissemination" for "adjudicative processes" is intended to exclude, from the scope of these guidelines, the findings and determinations that an agency makes in the course of adjudications involving specific parties. There are well-established procedural safeguards and rights to address the quality of adjudicatory decisions and to provide persons with an opportunity to contest decisions. These guidelines do not impose any additional requirements on agencies during adjudicative proceedings and do not provide parties to such adjudicative proceedings any additional rights of challenge or appeal.

67 Fed. Reg. at 8454. USDA's guidelines, in turn, exclude "documents prepared and released in the context of adjudicative processes." USDA Information Quality Guidelines, Definitions, § 2, *supra* note 4.

Prime Time sought disclosure and correction under the IQA of the data that USDA used to calculate its FETRA assessments, USDA never responded, and Prime Time challenges that non-response.[6] USDA maintains that the IQA does not mandate the issuance of information but merely instructs OMB to "provide

---

*Federal Agencies*; Republication, 67 Fed. Reg. 8452 (Feb. 22, 2002) ("OMB Guidelines").

[6] Prime Time also submitted, pursuant to the Freedom of Information Act, 5 U.S.C. § 552, a request for the data underlying its assessments, which USDA denied and Prime Time did not appeal.

policy and procedural guidance" for ensuring quality, utility, and integrity of information.  44 U.S.C. § 3516 note (a).  Prime Time relies, however, on the provision that requires agencies to "establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency."  *Id.* § (b)(2)(B).  Regardless, because Congress delegated to OMB authority to develop binding guidelines implementing the IQA, we defer to OMB's reasonable construction of the statute.  *See United States v. Mead*, 533 U.S. 218, 226–27 (2001).  The IQA is silent on the meaning of "dissemination," and in defining the term OMB exercised its discretion to exclude documents prepared and distributed in the context of adjudicative proceedings.  This is a permissible interpretation of the statute, *see Chevron*, 467 U.S. at 843, and Prime Time does not contend otherwise.  Rather, Prime Time attempts to avoid the consequences of the IQA exemption for adjudications on the ground it is waived because USDA did not raise it in the district court.

This court has repeatedly recognized that issues and legal theories not asserted in the district court "ordinarily will not be heard on appeal."  *See, e.g.*, *Horowitz v. Peace Corps*, 428 F.3d 271, 282 (D.C. Cir. 2005); *Hall v. Ford*, 856 F.2d 255, 267 (D.C. Cir. 1988); *District of Columbia v. Air Florida, Inc*., 750 F.2d 1077, 1084 (D.C. Cir. 1984) .  The reasons for this rule are clear:

> [O]ur procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact.  This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.

*Hormel v. Helvering*, 312 U.S. 552, 556 (1941).

USDA did not raise the "exemption for adjudications" argument in the district court, so normally it would be forfeited. *See generally United States v. Olano*, 507 U.S. 725, 733 (1993). However, in *Singleton v. Wulff*, 428 U.S. 106, 121 (1976), the Supreme Court observed:

> The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule. Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, *see Turner v. City of Memphis*, 369 U.S. 350 (1962).

The "proper resolution [of the IQA issue] is beyond any doubt," so this court is free to reach it. The issue involves a straightforward legal question, and both parties have fully addressed the issue on appeal. Consequently, no "injustice" will be done if we decide the issue. *Id.* USDA's determination of Prime Time's assessments for three quarters of FY 2005 was an adjudication, attendant to which Prime Time had rights to an administrative appeal and judicial review. *See* 5 U.S.C. § 551(7) (defining "adjudication"); 7 U.S.C. § 518d(i), (j). Prime Time's contention that USDA violated the IQA when it did not respond to a request to disclose and correct certain information underlying the tobacco assessments thus fails.

Accordingly, we reverse the grant of summary judgment to USDA on Prime Time's FETRA claims, we do not reach its due process claims in view of USDA's representation about requested data that will become available to Prime Time upon

remand, and we affirm the dismissal of the IQA challenge, although on a different ground than relied upon by the district court.