09-2021-cv
Natural Resources Defense Council, Inc. v. U.S. Dep't of Agriculture

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2009
(Argued: April 6, 2010                    Decided: July 8, 2010)
Docket No. 09-2021-cv

----------------------------------------------------x

Natural Resources Defense Council, Inc.,

          Plaintiff-Appellant,

People of the State of California, Ex Rel, Attorney General Bill Lockyer, State of Connecticut, State of Illinois,

          Consolidated-Plaintiffs-Appellants,

State of New York,

          Consolidated-Plaintiff,

                    -- v. --

United States Department of Agriculture, Secretary Thomas J. Vilsack, of Agriculture, Administrator Cindy Smith, of the Animal and Plant Health Inspection Service of the United States Department of Agriculture,

          Defendants-Appellees.

----------------------------------------------------x

B e f o r e :  JACOBS, Chief Judge, WINTER and WALKER, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (Lawrence M. McKenna, Judge) holding that Defendants-Appellees complied with the National Environmental Policy Act and the Plant Protection Act when they adopted new regulations for the importation of

1

unmanufactured wood packaging material into the United States. Because we conclude that Defendants-Appellees considered all reasonable alternatives to the proposed rule, and did not act arbitrarily or capriciously in adopting a rule providing for either heat treatment or fumigation with methyl bromide of the wood material prior to importation, we AFFIRM the judgment of the district court.

BENJAMIN H. LONGSTRETH (David Doninger, Sarah Lipton-Lubet, on the brief), Natural Resources Defense Council, Washington, DC, for Plaintiff-Appellant.

Ken Alex, Supervising Deputy Attorney General for the State of California, Oakland, CA, for Consolidated-Plaintiff-Appellant State of California.

Kimberly P. Massicotte and Matthew Levine, Assistant Attorneys General for the State of Connecticut, Hartford, CT, for Consolidated-Plaintiff-Appellant State of Connecticut.

Rebecca A. Burlingham, Supervising Attorney, Office of the Attorney General for the State of Illinois, Chicago, IL, for Consolidated-Plaintiff-Appellant State of Illinois.

JOHN D. CLOPPER, Assistant United States Attorney (Sarah S. Normand, Assistant United States Attorney, on the brief), for Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, for Defendants-Appellees.

JOHN M. WALKER, JR., Circuit Judge:

This case concerns our national response to the significant environmental threat presented by plant pests and pathogens introduced into the United States through the importation of solid wood packaging material ("SWPM")–including pallets, crates, boxes, cases, and skids–used to support, protect, and carry commodities entering the country.  Exotic wood-boring insects that accompany SWPM, such as the pine shoot beetle, the Asian longhorned beetle, and the emerald ash borer, undisputedly pose a threat to U.S. agriculture and ecotourism, and to natural, cultivated, and urban forests.  While the environmental impact of these destructive insects is real, the United States cannot address this global threat alone, and the U.S. Department of Agriculture, through the Animal and Plant Health Inspection Service ("APHIS"), is required to balance environmental considerations, international guidelines, and global trade concerns in adopting a final rule for the importation of SWPM.

Plaintiffs-Appellants Natural Resources Defense Council, Inc. ("NRDC") and the States of California, Connecticut, and Illinois (collectively, "Plaintiffs") appeal from a judgment and order of the United States District Court for the Southern District of New York (Lawrence M. McKenna, Judge) holding that Defendants-Appellees ("Defendants") complied with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and

3

the Plant Protection Act ("PPA"), 7 U.S.C. § 7701 et seq., when they adopted a final rule concerning the treatment of imported SWPM.[1] The final rule required that all SWPM be either heat treated to a minimum wood core temperature of 56°C for a minimum of 30 minutes or fumigated with methyl bromide prior to being used in connection with the importation of goods into the United States. Because we conclude that Defendants considered all reasonable alternatives, and the environmental impact of each, and did not act arbitrarily or capriciously, in adopting the final rule, we affirm.

**BACKGROUND**

The facts of this case are largely undisputed and are set forth only as they may be relevant to Plaintiffs' challenge to this instance of APHIS's rulemaking. Plaintiffs claim that APHIS violated the NEPA and the PPA by failing to fully consider the reasonable alternative of a phased-in substitute materials requirement before adopting a final rule requiring that all SWPM be either heat treated or fumigated with methyl bromide prior to being used in the transport of goods into the United States.

With the growth of international trade and the corresponding

---

[1] The State of New York was also a Plaintiff in the underlying action. See Complaint, State of N.Y. v. U.S. Dep't of Agric., No. 05-cv-8008(LMM) (S.D.N.Y. June 4, 2007). However, it did not seek appellate review of the district court's March 9, 2009 judgment.

4

increase in the amount of pest-ridden SWPM being imported into the United States, on January 20, 1999, APHIS issued an advance notice of proposed rulemaking ("ANPR") that solicited public comment on how to strengthen existing restrictions on the importation of SWPM to control the introduction of exotic plant pests into the United States. See Importation of Unmanufactured Wood Articles; Solid Wood Packing Material, 64 Fed. Reg. 3049 (notice published Jan. 20, 2009). APHIS stated that its goal was "to maximize protection of U.S. agriculture and forests against exotic plant pests associated with SWPM without unduly affecting international trade or the environment." Id. at 3051.

The ANPR set forth several possible options for protecting against SWPM wood-boring insects: for example, the continued use of methyl bromide; the imposition of certain treatment requirements or SWPM bans on a country-by-country basis; a blanket requirement that all SWPM imported into the United States be heat treated, fumigated, or treated with preservatives; and a complete prohibition on the importation of any form of SWPM from any country. As to a complete prohibition on the importation of SWPM, the ANPR stated that the "advantages of this option are that it would provide the greatest protection against pest risk and could eventually result in decreased use of methyl bromide [an ozone-depleting chemical]. A disadvantage . . . is that it could have an undesirable effect on international trade. This

5

effect could be mitigated by a phase-in period to allow shippers to adjust to the prohibition . . . ." Id. In its ANPR, APHIS specifically solicited public comment regarding the cost-effectiveness and feasibility of, and the length of any necessary phase-in period for, a prohibition on SWPM and a substitute-materials-only requirement.

On May 20, 2003, APHIS proposed amending the existing regulations for the importation of SWPM to adopt the recommended guidelines approved in March 2002 by the Interim Commission on Phytosanitary Measures of the International Plant Protection Convention[2] (the "IPPC Guidelines"). See Importation of Solid Wood Packing Material, 68 Fed. Reg. 27,480 (proposed May 20, 2003). The IPPC Guidelines called for SWPM to be either heat treated or fumigated with methyl bromide, and to be stamped with an internationally recognized mark indicating treatment. APHIS sought to adopt the IPPC Guidelines because of an increase in plant pests found in non-treated SWPM being imported into the United States from locations other than China and Hong Kong, both of which were already subject to an interim treatment rule on the basis of their identified plant pest risk, see Solid Wood Packing Material from China, 63 Fed. Reg. 50,100 (Sept. 18, 1998)

---

[2] The International Plant Protection Convention ("IPPC") is an international agreement on plant health to which 173 governments, including the United States, are contracting parties. See http://www.ippc.int (last visited July 7, 2010).

(codified at 7 C.F.R. Pts. 319 & 354); Solid Wood Packing Material from China, 63 Fed. Reg. 69,539 (amended Dec. 17, 1998) (codified at 7 C.F.R. Pt. 319) ("China Interim Rule").  APHIS asserted that by adopting the IPPC Guidelines, the United States would be reducing pest risk while furthering its obligations under Article 3 of the World Trade Organization's Agreement on the Application of Sanitary and Phytosanitary Measures ("SPS Agreement"), which urges Member States to base their phytosanitary measures on international standards, guidelines, or recommendations, where they exist, thereby harmonizing plant protection standards on as wide a global basis as possible, see SPS Agreement, available at http://www.wto.org/english/docs_e/legal_e/15sps_01_e.htm; see also 19 U.S.C. § 3511(d)(3).  Finally, APHIS stated that adopting the IPPC Guidelines would standardize trade requirements, because China, Canada, the European Union, and many other U.S. trading partners were also planning to implement the IPPC Guidelines as their phytosanitary measure for the importation of SWPM.

In announcing the proposed rule, APHIS outlined the environmental hazards presented by wood-boring insects, discussed the efficacy of the heat and methyl bromide fumigation treatments in the IPPC Guidelines, and indicated APHIS's intention to adopt the IPPC Guidelines as its final rule.  APHIS acknowledged that the proposed rule would not completely eradicate all plant pest

7

risk, and a corresponding draft environmental impact statement ("Draft EIS") listed reasonable alternatives to the proposed rule, including, inter alia, taking no additional protective action; extending the China Interim Rule to all countries; instituting a comprehensive risk reduction program that would employ various phytosanitary measures based upon a particular country's risk of introducing pests to the United States; and prohibiting all importation of SWPM and requiring the use of substitute packing materials only. See APHIS, U.S. Dep't of Agric., Importation of Solid Wood Packing Material, Draft Environmental Impact Statement 7, 9-12 (2002).

The Draft EIS also noted four non-environmental factors that APHIS would consider before adopting an alternative: "(1) foremost, the efficacy of the alternative in mitigating risk; (2) the relative costs of the alternatives/methods; (3) the differing capabilities of exporting nations to comply with quarantine requirements; and (4) the need for harmonization of regulatory efforts among trading partner nations." Id. at 2. In discussing the environmental effects of each of the identified alternatives, the Draft EIS noted that the IPPC Guidelines "would result in substantial reduction in risk of introduction of pests and pathogens from SWPM" but "would result in the [second] greatest level of anticipated adverse environmental consequences from component methods because (1) it would require treatments of SWPM

8

from all countries, (2) it would result in substantial use of methyl bromide, and (3) it would continue to increase the demand for forest products." Id. at 10-11.

With respect to a prohibition on SWPM and the use of substitute packing materials, the Draft EIS stated that this alternative "would achieve the greatest possible reduction in risk from the introduction of pests and pathogens associated with SWPM," "would achieve the greatest reduction of adverse environmental consequences from the use of control methods (chemical and/or physical)," and "would result in diminished use of wood resources, but could result in increased use of other resources (e.g., ores for metal production and petroleum for plastics) and energy for manufacturing processes." Id. at 12. The Draft EIS further stated, however, that use of substitute packing materials might be limited due to a lack of current industry capability, increased expense associated with the materials, and the need for a phase-in period to allow the industry and developing nations to adapt to a complete prohibition on SWPM. The Draft EIS emphasized that while prohibiting SWPM was likely the most effective means of eliminating pest risk associated with the importation of goods, such a restriction might violate the SPS Agreement's stipulation that any phytosanitary measures implemented by contracting nations shall be no more trade-restrictive than necessary to

9

achieve the requisite level of plant protection.

Subsequent to the announcement of the proposed rule, additional public comment, and three public hearings, APHIS released a final environmental impact statement ("Final EIS") in August 2003, see APHIS, U.S. Dep't of Agric., Importation of Solid Wood Packing Material, Final Environmental Impact Statement (2003), and a final regulatory impact analysis ("Final RIA") in September 2004, see APHIS, U.S. Dep't of Agric., Regulatory Impact Analysis of the Final Rule to Adopt the International Standard on Wood Packing Material in International Trade (2004). In the Final EIS, APHIS again emphasized the effectiveness of the IPPC Guidelines in thwarting the introduction of plant pests into the United States and the IPPC Guidelines' role in harmonizing international phytosanitary regulations. APHIS also recognized that the greatest level of plant protection would result from a complete prohibition on SWPM, but explained that adopting such a measure presented feasibility issues, economic hurdles, and the potential that the United States would be held in violation of its obligations under international trade agreements. The Final EIS also noted that while the ANPR had specifically sought comments regarding the amount of time the industry would need to adapt to a substitute-materials-only requirement, no substantive information was provided to APHIS that could contribute to establishing a specific phase-out period for SWPM. As to this

issue of phase-out timing, APHIS stated as follows:

> No program decision has been made as to what constitutes an acceptable time period for implementation for a regulatory rule of this magnitude. . . . It is difficult for APHIS to specify a time period when the present ability of substitute packing manufacturers to supply the market indicates a need for extended growth of the industry. The compliance time is particularly difficult to project when the new regulations are specifically directed to address packing materials from foreign countries whose industries may be less able to adjust readily to proposed changes. Also, any decisions made by APHIS to improve phytosanitary measures against pests in packing materials require international negotiations with other countries to ensure their ability and concurrence with the measures being considered.

Final EIS at A-5.

As for the capability of substitute materials to meet market demands, APHIS stated that "current projections indicate that the increase in use of substitute packing materials could constitute no more than 10 to 15 percent of the total market in the next several years." Id. at 89. In the Final RIA, APHIS estimated that substitute packing materials constituted no more than five percent of the packing market and presented certain logistical and economic limitations that made their widespread acceptance unlikely. See Final RIA at 18, 20-21.

On September 16, 2004, APHIS issued a final rule adopting the IPPC Guidelines and mandating either heat treatment or fumigation with methyl bromide for all SWPM used in connection with the importation of goods into the United States, effective September 16, 2005. See Importation of Solid Wood Packaging

11

Material, 69 Fed. Reg. 55,719 (Sept. 16, 2004) (codified at 7 C.F.R. pt. 319). APHIS chose the IPPC Guidelines because "they represent the current international standard determined . . . to be necessary and effective for controlling pests in SWPM," and because adopting them "would simplify and standardize trade requirements." Id. at 55,719. In summarizing its response to public comment on the rule, APHIS noted that some commenters urged APHIS to phase out SWPM in favor of substitute packing materials on the basis that this alternative was the least harmful to the environment. APHIS stated that it would continue to work with IPPC members to develop alternative treatments to using ozone-depleting methyl bromide, but that the chosen treatments were currently the most technically and economically feasible methods of responding to the plant pest problem.

On September 15, 2005, the NRDC and the Plaintiff-States sued APHIS in separate actions, each asserting violations of section 102 of the NEPA, 42 U.S.C. § 4332, and section 412 of the PPA, 7 U.S.C. § 7712, and seeking judicial relief in accordance with section 10(e) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C), & (D). After the district court consolidated the cases, the parties filed cross-motions for summary judgment, and on June 4, 2007, the district court granted in part and denied in part both Plaintiffs' and Defendants'

12

motions.[3]  The district court characterized Plaintiffs' challenge as "the failure of APHIS to properly consider and weigh an unadopted alternative to heat treatment or fumigation with methyl bromide: a phased transition away from raw wood pallets and crates, replacing them with packing materials made of substitute materials, such as processed wood, fiberboard, plywood, and plastics, that are impervious to the insect pests." Natural Res. Def. Council, Inc. v. U.S. Dep't of Agric., Nos. 05 Civ. 8005 & 05 Civ. 8008, 2007 WL 1610420, at *1 (S.D.N.Y. June 4, 2007) (internal quotation marks omitted).  The district court noted that Plaintiffs did not seek to have the final rule overturned; rather, they sought to have the district court "order APHIS to reconsider its environmental impact analysis in light of its obvious defects and then to revise the rule as appropriate based on any supplemental findings." Id. (internal quotation marks omitted).  The district court rejected Plaintiffs' challenge under the NEPA, concluding that APHIS adequately considered the environmental impact of the proposed rule and four alternatives, including a phased-in substitute-materials-only alternative. Id. at *6.  The district court also rejected Plaintiffs' challenge that Defendants violated the PPA by failing to adopt the

---

[3]  The district court granted Plaintiffs' motion only with respect to their challenge that the final EIS underestimated the amount of ozone-depleting methyl bromide that would be released into the atmosphere under the rule.  That issue, now resolved, is not a part of this appeal.

alternative that would most effectively reduce the introduction of plant pests into the United States.  Id. at *4-5.

This appeal followed.

**DISCUSSION**

We review the district court's ruling on cross-motions for summary judgment de novo, in each case construing the evidence in the light most favorable to the non-moving party.  See Fund for Animals v. Kempthorne, 538 F.3d 124, 131 (2d Cir. 2008).  Our review under the APA is limited, however, and we may disturb agency action if, inter alia, it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," in excess of the agency's statutory jurisdiction or authority, or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), & (D).  In reviewing an agency's rationale for adopting a particular rule, "we must be satisfied that the agency examined the relevant data and established a 'rational connection between the facts found and the choice made.'"  Fund for Animals, 538 F.3d at 132 (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  "'The agency's action should only be set aside if it relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

14

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the products of expertise.'" Id. (quoting Cellular Phone Taskforce v. FCC, 205 F.3d 82, 90 (2d Cir. 2000) (internal quotation marks and alteration omitted)).

## I.   National Environmental Policy Act

### A.   Overview

The NEPA "establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." Dep't of Transp. v. Public Citizen, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321). As such, the "NEPA requires a federal agency to prepare an EIS before taking any major action significantly affecting the quality of the human environment." Coal. on W. Valley Nuclear Wastes v. Chu, 592 F.3d 306, 310 (2d Cir. 2009) (internal quotation marks omitted); see 42 U.S.C. § 4332(2)(C). "The purpose of an EIS is to provide full and fair discussion of significant environmental impacts and to inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." Natural Res. Def. Council, Inc. v. FAA, 564 F.3d 549, 556 (2d Cir. 2009) (internal quotation

15

marks and alteration omitted); see also 42 U.S.C. § 4332(2)(C). Thus, the NEPA does not mandate particular results; it "imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." Public Citizen, 541 U.S. at 756-57 (citing Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349-50 (1989)).

Our only role in reviewing agency action for compliance with the NEPA "is to insure that the agency has taken a hard look at environmental consequences." Coal. on W. Valley Nuclear Wastes, 592 F.3d at 310 (internal quotation marks omitted). We cannot "interject [ourselves] within the area of discretion of the executive as to the choice of the action to be taken," and we cannot "rule an EIS inadequate if the agency has made an adequate compilation of relevant information, has analyzed it reasonably, has not ignored pertinent data, and has made disclosures to the public." Id. (internal quotation marks omitted). "Significantly, 'if the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.'" Natural Res. Def. Council, Inc. v. FAA, 564 F.3d at 556 (quoting Robertson, 490 U.S. at 350).

**B. Discussion**

16

Plaintiffs assert that APHIS adopted the final rule in violation of the NEPA because APHIS failed to adequately consider the reasonable alternative of a phased-in substitute-materials-only requirement. Plaintiffs' challenge is two-fold: (1) that APHIS considered only an immediate, and not a phased-in, prohibition on SWPM; and (2) that APHIS unreasonably failed to assess the long-term feasibility of a substitute-materials-only requirement, and more specifically, "how the cost of substitute materials could come down, or how quickly the market share of substitute materials could expand, in response to a regulation requiring a transition to such materials over a reasonable time period." Appellants' Br. at 18-19. Both challenges fail for the reasons set forth below.

The administrative record with respect to the importation of SWPM reflects several statements that make clear that any substitute-materials-only requirement would perforce be phased in rather than implemented immediately. See Natural Res. Def. Council, Inc. v. U.S. Dep't of Agric., 2007 WL 1610420, at *6 (noting phase-in language in the ANPR, Draft EIS, and Final EIS). Furthermore, while the Final EIS discusses substitute packing materials as a component of a broader comprehensive risk reduction program as well as a stand-alone alternative to SWPM, it is clear that, under either scenario, APHIS recognized that a phase-in period would be required:

17

The capability of industry to tool up to manufacture and switch to substitute packing materials for such a shipping volume may limit the feasibility or implementation of a switch over. Substitute packing materials are more expensive than SWPM. Although some substitute packing materials show great promise . . ., other materials have limitations on their use. Substitute packing materials would require a phase-in period to allow the industry of the regulated countries to adapt these materials to the shipping processes. Compliance with international agreements is expected to increase the costs associated with the use of SWPM and this change may make substitute packing materials more competitive in the packing market and indirectly promote use of these other materials.

Final EIS at 41. Plaintiffs' assertions notwithstanding, it cannot fairly be said that APHIS considered only an immediate ban on SWPM and not a phased-in substitute-materials-only requirement.

Plaintiffs' second challenge concerns the depth of APHIS's consideration of the substitute-materials-only alternative. As to this argument, we conclude that APHIS adequately evaluated the substitute-materials-only alternative and reasonably explained its decision not to adopt it as the final rule at the present time. "Under [the] NEPA, an agency's discussion of 'alternatives to the proposed action,' 42 U.S.C. § 4332(2)(C)(iii), forms 'the heart of the environmental impact statement,' 40 C.F.R. § 1502.14." Natural Res. Def. Council, Inc. v. FAA, 564 F.3d at 557. However, an agency satisfies its duty under the NEPA where it "[r]igorously explore[s] and objectively evaluate[s] all reasonable alternatives, and for alternatives which were

18

eliminated from detailed study, briefly discuss[es] the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a); see also Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195 (D.C. Cir. 1991) ("If . . . the consideration of alternatives is to inform both the public and the agency decisionmaker, the discussion must be moored to some notion of feasibility." (internal quotation marks and footnote omitted)).

Under the facts of this case, APHIS reasonably concluded that while a phased-in substitute-materials-only requirement would provide maximum plant protection with minimal adverse environmental consequences, it is not currently a workable alternative to an urgent problem in need of an immediate response. APHIS reached this conclusion because adopting such a rule would require international negotiations to expand the level of plant protection beyond that afforded by the IPPC Guidelines. In the absence of an international consensus, adoption of such a rule by the United States could disrupt international trade and result in a potential violation of U.S. obligations under the SPS Agreement. Moreover, the negotiations would be time-consuming, and their outcome would depend upon a variety of factors, including developing nations' technical capacities and anticipated economic growth.

While Plaintiffs would have liked for APHIS to have more fully examined the likely effects of adopting Plaintiffs' desired

19

alternative on the global market for substitute materials, the Final EIS complied with the NEPA. It provided sufficient information for the agency and public to take into account the environmental impact of each of the alternatives presented and for APHIS to make a reasoned decision as to how best to proceed with plant protection in light of the competing considerations of pest control and environmental concerns, on the one hand, and, on the other, the harmonization and facilitation of global trade.

That numerous forecasts and predictions related to the adoption of a substitute-materials-only requirement were not included in the Final EIS was explained by APHIS at the outset: "The necessity for extensive negotiations with other countries precludes the ability to establish meaningful timetables for any anticipated changes in regulations of packing materials worldwide." Final EIS at 6. The Final EIS also noted that "[t]he wide differences in perspective among respondents on the draft EIS as to the ability of the packing industry to switch to packing materials other than SWPM provide no clear consensus on the relative ability to implement such an alternative." Id. at A-4. Importantly, APHIS stated that "[a]ny decision to designate a specific time for completion of actions [will be] made by the decisionmaker after review of an economic assessment, the logistics of implementation of a specific course of action, the potential international negotiations involved, and any trade

20

implications for the United States and other countries." Id. at A-5.

While Plaintiffs fault APHIS for not forecasting how the international market for substitute packing materials might expand over time if a phased-in substitute-materials-only requirement were promulgated by the United States, such forecasts were not necessary for APHIS's completion of a comprehensive EIS or its compliance with the NEPA. See Natural Res. Def. Council, Inc. v. Callaway, 524 F.2d 79, 90 (2d Cir. 1975) ("[The agency] is not required to study and report on the effect of . . . a relationship as yet not understood. Nor does it need to consider other projects so far removed in time or distance from its own that the interrelationship, if any, between them is unknown or speculative."). The Final EIS in this case adequately sets forth the environmental risks and benefits of numerous reasonable alternatives to APHIS's proposed action of adopting the IPPC Guidelines and explains the agency's decision not to pursue further a substitute-materials-only alternative because of current global trade considerations; it was not required to speculate on the potential changes to the global cost and availability of substitute materials in the event that APHIS were to adopt a phased-in substitute-materials-only requirement. See Fund for Animals, 538 F.3d at 137 ("Where there is uncertainty regarding the potential effects of an agency action, speculation

21

in an EIS is not precluded, but the agency is not obliged to engage in endless hypothesizing as to remote possibilities." (internal quotation marks and alterations omitted)). Accordingly, we conclude that the Final EIS complied with the NEPA.

## II.  Plant Protection Act

### A.    Overview

The PPA was enacted to detect, eradicate, suppress, and prevent the spread of plant pests and noxious weeds.  See 7 U.S.C. § 7701(1).  Under the PPA, "it is the responsibility of the Secretary [of Agriculture] to facilitate exports, imports, and interstate commerce in agricultural products and other commodities that pose a risk of harboring plant pests . . . in ways that will reduce, to the extent practicable, as determined by the Secretary, the risk of dissemination of plant pests . . . ."  Id. § 7701(3); see also id. § 7702(16).  The PPA vests the Secretary with authority to issue regulations "to prevent the introduction of plant pests into the United States," id. § 7711(a), and to "prohibit or restrict the importation . . . of any . . . plant product, . . . article, or means of conveyance, if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction [of a plant pest] into the United States," id. § 7712(a); see also id. § 7754.  "The Secretary shall ensure that phytosanitary issues involving

imports and exports are addressed based on sound science and consistent with applicable international agreements." Id. § 7751(e). The Secretary has delegated his authority under the PPA to APHIS. See Monsanto Co. v. Geertson Seed Farms, No. 09-475, slip op. at 2 (U.S. June 21, 2010) (citing applicable regulations).

**B.    Discussion**

We agree with the district court that the Defendants did not violate the PPA by failing to elevate environmental concerns over other legitimate factors when formulating the final SWPM rule. See Natural Res. Def. Council, Inc. v. U.S. Dep't of Agric., 2007 WL 1610420, at *4-5. The Secretary's decision to require either heat treatment or fumigation with methyl bromide was not an abuse of discretion given his dual responsibility to protect plants by reducing plant pest risk and to facilitate commerce by avoiding unduly burdensome trade restrictions. Because the record is clear that the Secretary considered the relevant environmental and commercial concerns when deciding on a final SWPM rule, the Secretary cannot be said to have abused his discretion in ultimately concluding that adopting the measures specified in the IPPC Guidelines best accomplished these dual objectives. Finally, Plaintiffs' argument that the Secretary's decision was arbitrary and capricious because he failed to adequately consider a phased-in substitute-materials-only requirement, and the

magnitude of the impact on trade from such a requirement, echoes the argument advanced in Plaintiffs' NEPA challenge and it fails for the same reasons.

**CONCLUSION**

Accordingly, we AFFIRM the district court's March 9, 2009 judgment and June 4, 2007 memorandum and order.