HABITAT FOR HORSES, a Texas non-Profit corporation, American Society for the Prevention of Cruelty to Animals, a New York non-profit corporation, The Cloud Foundation, a Colorado non-profit Corporation, Toni Moore, and Dr. Don Moore, Plaintiffs,

v.

Ken SALAZAR, in his official capacity

as Secretary, U.S. Department of the Interior, Robert Abbey, in his official capacity As Director, Bureau of Land Management, Kent Walter, in his official capacity as Field Manager, Bureau of Land Management, White River Field Office, Defendants.

No. 10 Civ. 7684(WHP).

United States District Court,
S.D. New York.

Oct. 21, 2010.

Bruce A. Wagman, Esq., Schiff Hardin LLP, San Francisco, CA, Thomas P. Battistoni, Esq., Schiff Hardin LLP, New York, NY, for Plaintiffs.

Amy A. Barcelo, Esq., Assistant United States Attorney, U.S. Attorney's Office, SDNY, New York, NY, for Defendants.

*MEMORANDUM & ORDER*

WILLIAM H. PAULEY III, District Judge:

While this Court is accustomed to dealing with bulls and bears on Wall Street, this case turns its attention westward to wild horses in Colorado. Plaintiffs invoke the Wild Free–Roaming Horses and Burros Act of 1971, a statute never previously considered in the Second Circuit. They seek to stop a gather of wild horses underway on public land known as the North Piceance Herd Area.

Plaintiffs Habitat for Horses ("Habitat"), American Society for the Prevention of Cruelty to Animals ("ASPCA"), The Cloud Foundation, Toni Moore, and Dr. Don Moore bring this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, against Ken Salazar, Secretary of the Department of the Interior ("DOI"), Robert Abbey, Director of the Bureau of Land Management ("BLM"), and Kent Walter ("Walter"),

Field Manager of the BLM White River Field Office. Plaintiffs claim that the BLM's decision to remove wild horses from the North Piceance Herd Area (or "North Piceance") in Colorado violates the Wild Free–Roaming Horses and Burros Act of 1971 ("Wild Horses Act"), 16 U.S.C. § 1331 *et seq.*, the Information Quality Act ("IQA"), Pub.L. 106–554 § 515, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, and regulations promulgated thereunder.

This action has proceeded at breakneck speed. On October 14, 2010, Plaintiffs moved to preliminarily enjoin BLM's North Piceance gather. On October 15, this Court denied Plaintiffs' application for a temporary restraining order that the BLM cease removal of wild horses and return those already removed. On October 16, Plaintiffs renewed their application, premised on the deaths of two horses during gather operations outside North Piceance. On October 17, this Court denied Plaintiffs' renewed application.

On October 20, 2010, this Court held an evidentiary hearing and heard oral argument on Plaintiffs' application for a preliminary injunction. While Defendants objected to venue in this District initially, they withdrew that objection at the conclusion of the evidentiary hearing. (Transcript of Oral Argument dated Oct. 20, 2010 ("Tr.") at 90.) Thus, this Court need not consider that issue here. For the following reasons, Plaintiffs' application for a preliminary injunction is denied.

## BACKGROUND

### I. *The North Piceance Herd Area*

This action centers on the BLM's decision to remove approximately 60 wild horses in the North Piceance Herd Area, a 79,500 acre land expanse located in northwestern Colorado and more than five times

larger than Manhattan. (Complaint dated Oct. 7, 2010 ("Compl.") ¶¶ 56–57; Declaration of Thomas P. Battistoni dated Oct. 14, 2010 ("Battistoni Decl.") Ex. 2: Environmental Assessment dated July 29, 2010 ("EA") at 2, 18.) The North Piceance Herd Area is part of the White River Resource Area, which includes the Piceance–East Douglas Herd Management Area ("Piceance East"), the West Douglas Herd Area ("West Douglas"), and other undesignated areas. (Compl. ¶ 57; *see* EA at 108, Map 1.)

In 1974, the BLM conducted the first census of wild horses residing within the White River Resource Area. (Compl. ¶ 57.) The census counted 146 horses—135 in the area now designated as Piceance East and 9 in the area now designated as West Douglas. No wild horses were found in North Piceance. (Compl. ¶ 57; Declaration of Kent E. Walter dated Oct. 17, 2010 ("Walter Decl.") ¶ 13.) In 1975, the BLM prepared the White River Resource Area Management Framework Plan to manage the various uses of these vast federal lands. (EA at 7.) That plan included the removal of all wild horses west of Douglas Creek, which included areas later designated as North Piceance and West Douglas. (EA at 7.)

In 1980, the BLM updated the Management Framework Plan (the "1980 Plan") and selected Piceance East for wild horse management because its topography and resource distribution were most "highly suited to the needs of wild horses." (Walter Decl. ¶ 14; EA at 8.) Those lands not included in the herd management area were designated as West Douglas and the North Piceance Herd Area. (Walter Decl. ¶ 14.) The 1980 Plan concluded that the BLM "could not maintain a thriving natural ecological balance and multiple-use relationship" in West Douglas and North Piceance. (Walter Decl. ¶ 14.)

On July 1, 1997, the State Director approved the White River Resource Area Management Plan (the "1997 Plan"), which established the land use decision process currently in place. (EA at 8.) The 1997 Plan established a target wild horse population level—known as the appropriate management level ("AML")—of between 95 and 140 wild horses for Piceance East. (EA at 8; Walter Decl. ¶ 15.) The AML is "the maximum population at which a thriving natural ecological balance would be maintained and to avoid deterioration of the rangeland." (EA at 33.) The 1997 Plan further concluded that the North Piceance Herd Area would "be managed in the short-term (0–10 years) to provide forage for a herd of 0 to 50 horses." (EA at 8.) The 1997 Plan set forth that "[t]he long term objective (+10 years)" was "to remove all wild horses from" the North Piceance Herd Area. (EA at 8.)

In 1999, the BLM increased the AML range for Piceance East to between 135 and 235 horses and added a portion of North Piceance to the herd management area. The White River Field Office reaffirmed this AML in 2002. (EA at 8; Battistoni Decl. Ex. 2: Decision Record dated Sept 10, 2010 ("Decision Record").) The BLM conducted horse gathers in Piceance East in 1999, 2002, and 2006 to prune the population to the AML range of 135 to 235 wild horses. (*See* EA at 22.)

## II. *BLM's 2010 Environmental Assessment*

In February and March 2010, the BLM conducted an aerial census of the White River Resource Area. (Battistoni Decl. Ex. 1: Census of Piceance–East Douglas Herd Management Area dated Feb. & Mar. 2010 ("2010 Censes"); EA at 3.) The survey counted 265 horses within Piceance East and 49 horses in the North Piceance Herd Area. (2010 Census at 7; EA at 3, 18, 21.) The Piceance East population exceeded the AML high end by 30 horses and the lower limit by 130 horses. (EA at 3.) BLM best management practices instruct that an aerial census of wild horses can undercount the actual population by as much as 60%. (EA at 3.)

On March 25 and April 1, 2010, the BLM published notices of its intent to develop an Environmental Assessment in preparation for a gather to reduce the population within Piceance East and in the adjacent areas to AML-compliant levels. (EA at 4.) The purpose of the Environmental Assessment was to "disclos[e] and analyz[e] the environmental consequences of gathering excess wild horses," in compliance with NEPA requirements. (EA at 2.)

On July 28, 2010, the BLM released a preliminary Environmental Assessment to the public and provided 30 days for review and comment in accord with the BLM Washington Office Instruction. (EA at 5.) The BLM received 2,275 comments—including one comment from an officer of The Cloud Foundation but none from Habitat, the ASPCA, Dr. Don Moore, or Toni Moore. (Walker Decl. ¶ 19.)

The 109–page Environmental Assessment considered three alternative courses of action. As required under the Colorado BLM's Standards for Public Health, the Environmental Assessment analyzed and made findings on the consequences of each alternative on five environmental systems: upland soils, riparian systems, plant and animal communities, threatened and endangered species, and water quality. (EA at 16.) The study devoted significant analysis to a gather's effects on the wild horse population, including herd age, sex, and color ratios; distribution; genetics; and population history. (EA at 16–35.) The cumulative analysis area for the study "include[d] [Piceance East] and areas immediately surrounding the areas [sic] including the North Piceance Herd Area." (EA at 34.)

The White River Field Office endorsed Alternative A, which allowed the BLM to gather all the horses in Piceance East and then release 135 back into that herd management area so that Piceance East's population would be at the AML's low end. (EA at 8–9.) Further, "to comply with 43 CFR 4710.4," all horses outside Piceance East would be removed unless the BLM determined some could be moved into Piceance East. (EA at 11.) The gather would be conducted by a contractor experienced in the humane capture and handling of wild horses. (EA at 9.) The BLM predicted employing four gather methods: helicopter drive trapping, in which low-flying helicopters steer horses into pre-constructed traps; roping from horseback; water trapping, in which water sources are used to attract horses into traps; and hay trapping, in which hay attracts horses into traps. (EA at 9–11.)

The Environmental Assessment noted that while "[t]here is always the possibility that wild horses will be injured or killed during any phase of the gather and removal operation," BLM would follow standard operating procedures to "ensure a safe and humane gather occurs" and "minimize potential stress and injury to wild horses." (EA at 25; *see* EA App'x A: Standard Operating Procedures for Wild Horse Gathers.) Mortality rates during gathers vary significantly depending on topography and the horses' genetic background. (EA at 28.) Historically, the White River Field Office has experienced an average of less than a 1% mortality rate, which is "considered low when handling wild animals." (EA at 28.) The euthanization rate is less than 0.5%. (EA at 28.)

The BLM targeted the lower rather than the higher AML limit to avoid more frequent gather operations and unnecessary disruption to the herd. (EA at 15, 26.) The sex ratio of released horses would be 60% studs and 40% mares to decrease future annual population growth. (EA at 11.) Older mares would be treated with the fertility control drug PZP. (EA at 11–12.) Following the gather in North Piceance, those horses identified for relocation would be released into Piceance East. (EA at 27.) Injured horses would be treated by a veterinarian or, if necessary, humanely euthanized by qualified personnel. (EA at 27.) All removed horses would be housed in permanent holding facilities located in Cañon City, Colorado. (EA at 12.)

The Environmental Assessment concluded that because the AML would be maintained through Alternative A, forage and water resources would increase, and the range condition would improve, "promot[ing] healthy, viable, self-sustaining populations of wild horses." (EA at 30.) After excess horses were removed, a regular population would be obtained and "wild horses [would] no longer gain access beyond the [Piceance East] boundary." (EA at 34.) In addition, management of the horse population "in balance with the habitat and other multiple uses" would "ensure that the populations are less affected by drought or other climate fluctuations, and that emergency gathers are either avoided or minimized, thus reducing stress to the wild horses, and increasing the long-term success of the herd." (EA at 30.)

Under Alternative B, the gather would proceed as under Alternative A except that mares would not be treated with immuno-contraception drugs and the sex ratio of released horses would be 50% studs and 50% mares. (EA at 14.) The economic consequence of this alternative was a 30% higher herd growth rate than that of Alternative A, which would necessitate gathers every three years instead of the current four-year gather schedule. (EA at 15, 32–33.)

Under Alternative C, the BLM would suspend the proposed gather. (EA at 14.) As BLM noted, "[w]ild horse populations are not self regulating," and few natural predators exist to control their numbers. (EA at 25, 35.) The BLM calculated that the wild horse population would expand at the existing 20% annual rate to an estimated 382 horses inside Piceance East and 166 horses outside it by 2011. (EA at 15.) The economic consequence of Alternative C was that the population would exceed the range's carrying capacity and the habitat would be unable to support the horses. (EA at 33.) Alternative C "pose[d] the greatest risk to the health and viability of the wild horse population, wildlife populations, water resources, and the vegetative resources." (EA at 33.) At present numbers, the horses would degrade the rangelands "already in less than desirable or degraded condition," and deplete forage and water resources until the horses died of dehydration and starvation. (EA at 33–34.) These conditions would require "emergency gather[s] to alleviate wild horse suffering and/or mortality." (EA at 35.)

### III. *White River Field Office's 2010 Gather Decision & FONSI*

Against this backdrop, the White River Field Office endorsed Alternative A and the removal of all wild horses "determined to be excess" which were located within Piceance East and "adjacent lands." (EA at 2, 8.) On September 10, 2010, Walter, Field Manager of the White River Field Office, issued a Decision Record and Finding of No Significant Impact ("FONSI"). The FONSI set forth BLM's findings that upon considering "the context and the intensity of impacts described in the EA," the proposed gather "would not significantly affect the quality of the human environment." (Battistoni Decl. Ex. 2: FONSI dated Sept. 10, 2010 ("FONSI") at i.) Therefore, an Environmental Impact Statement ("EIS") was not required for compliance with NEPA. (FONSI at i.) The FONSI explained that the effects of the gather "are well known and understood based upon previous gathers" and that the Environmental Assessment documented "the known effects on the human environment." (FONSI at ii.)

Based on "information currently available," the Decision Record states that the BLM found an excess of wild horses within and outside Piceance East, which "require[d] immediate removal" under the Wild Horses Act. (Decision Record at 1.) Walter adopted Alternative A with the exception that removal of excess horses from Piceance East would be delayed until further analysis was completed. (Battistoni Decl. Ex. 2: Decision Record dated Sept. 10, 2010 ("Decision Record") at 2.) The gather operation was "limited to the removal of all the wild horses (about 138 animals) permanently residing outside [Piceance East] in areas not designated for their long-term use," including North Piceance. (Decision Record at 2.)

The BLM explained that the 1997 Plan was the most recent approved land use plan and delineated the boundaries of Piceance East, the herd management area. (Decision Record at 3.) Pursuant to the 1997 Plan, the "wild horses permanently residing outside of [Piceance East] are in areas not designated for their long-term use and a thriving natural ecological balance cannot be maintained with other resource use allocations." (Decision Record at 3.) Accordingly, the horses located outside Piceance East were "determined to be defined as excess and must be removed as per 43 CFR 4720.1." (Decision Record at 3.)

The gather began on October 11, 2010 and will conclude on October 22, 2010. (Walter Decl. ¶¶ 2–3; Tr. at 63.) Once selected horses are re-released into Pi-

ceance East, all excess wild horses will be removed and transported to the Canon City holding facility approximately 160 miles away. (EA at 30; Declaration of Francis G. Ackley dated Oct. 17, 2010 ("Ackley Decl.") ¶ 15.) There, they will be available for adoption or sale to qualified individuals or taken to long-term pastures. (EA at 30.) Over the last three years, 62% of excess animals removed in gathers were adopted and 8% sold to qualified buyers. (EA at 31.) Animals housed in long-term pastures remain available for adoption or sale. (EA at 31.)

## IV. *This Action*

Three animal rights groups and two concerned individuals challenge BLM's decision in this action. Habitat is a Texas non-profit corporation dedicated to educating the public on proper horse care, assisting in animal cruelty investigations, and rescuing horses. (Declaration of Jerry Finch dated Oct. 12, 2010 ("Finch Decl.") ¶ 2.) Since 1998, Habitat has devoted organizational funds to rescue and care for horses removed in BLM roundups and then mistreated by subsequent owners. (Finch Decl. ¶¶ 5–7.) The ASPCA is a New York non-profit corporation devoted to animal welfare, which has expended "hundreds of thousands of dollars to assist in the rescue, rehabilitation and care of horses removed by the BLM." (Declaration of Matt Bershadker dated Oct. 12, 2010 ¶¶ 2–3.) The Cloud Foundation is a Colorado non-profit corporation dedicated to protecting the Pryor Mountain Wild Horse Herd in Montana and other wild horse herds with historical significance. (Declaration of Ginger Kathrens dated Oct. 10, 2010 ("Kathrens Decl.") ¶¶ 2–3.) Since 2005, The Cloud Foundation has diverted funds to counteract BLM gathers and care for horses removed from the range. (Kathrens Decl. ¶ 3.)

Dr. Don Moore and Toni Moore are longtime Colorado residents who frequently visit North Piceance to observe and enjoy the wild horses "in their natural habitat." (Tr. at 35; Declaration of Donald E. Moore dated Oct. 10, 2010 ("Dr. Moore Decl.") ¶¶ 2, 3; Declaration of Toni H. Moore dated Oct. 10, 2010 ("Moore Decl.") ¶¶ 2, 3.) Observing the wild horses "in their natural surroundings and running free is essential" to the Moores' "aesthetic enjoyment of these trips," which they intend to continue taking. (Dr. Moore Decl. ¶ 3; *see* Moore Decl. ¶ 4.) Dr. Moore testified to his sensory enjoyment of the horses' "freedom of movement": "It's something that we can smell, we can see, we can experience the wild in a way that you cannot experience in any other way." (Tr. at 41.) Toni Moore states that "i[t] would be impossible to replace the cultural and historical significance [the horses] add to the landscape." (Moore Decl. 14.)

Dr. Moore testified that he was "personally connected to the North Piceance Herd Area." (Tr. at 59.) From the time he was five years old, his father took him there to observe wild horses. (Tr. at 27.) Over the intervening fifty-eight years, he has frequented the area and enjoyed "since my earliest childhood, horses in the area, that have fairly consistent character." (Tr. at 59.)

While Dr. Moore testified that he also enjoys watching horses in Piceance East, the distinction between that herd management area and North Piceance seemed "arbitrary," and he explained: "They are contiguous ... [a]nd when I see one, I see the other." (Tr. at 56–57.) Although the horses maintain separate bands, they move throughout the range. (Tr. at 35, 39, 46.) Dr. Moore testified that while certain horses in North Piceance have distinctive characteristics, he has seen horses with the same characteristics in Piceance East. (Tr. at 39–40, 48–55.) Dr. Moore explained that although there is a fence to delineate

the herd management area, the gate is often left open and the horses "migrate back and forth" regularly from the herd area into the herd management area. (Tr. at 54, 57.)

Plaintiffs assert the Decision Record and Environmental Assessment are insufficient because they fail to specify how BLM will identify horses permanently residing outside Piceance East, as opposed to being found there at the time of capture. (Compl. ¶ 65.) They allege the horses' seasonal migration patterns make it "impossible" for BLM to make this determination, which is the ground for deeming a horse "excess." (Compl. ¶ 66–67.) Plaintiffs contend that the BLM is eliminating horses in North Piceance "for its convenience," and claim that this gather is part of BLM's pattern and practice of reducing a herd's population until it is genetically unviable, justifying removal of the herd. (Compl. ¶¶ 64, 70–71.)

The gather will conclude on October 22. The following day, the gathered horses that are not returned to Piceance East will be transported to Canon City. Once they enter the BLM's holding facility, they cannot be returned to North Piceance, and the motion for a preliminary injunction will be moot.

## DISCUSSION

### I. Preliminary Injunction Standard

Preliminary injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consolidated Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir.2005). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore*, 409 F.3d at 510. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008).

The Court of Appeals has found that even after *Winter*, a district court may grant a preliminary injunction where, instead of a likelihood of success on the merits, the plaintiff shows "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund*, 598 F.3d 30, 35, 38 (2d Cir.2010). However, "a plaintiff cannot rely on the 'fair ground for litigation' alternative" where, as here, the plaintiff "challeng[es] 'governmental action taken in the public interest pursuant to a statutory or regulatory scheme,'" but must "establish a likelihood of success on the merits." *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir.2010) (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)).[1]

### II. Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v.*

---

1. Because Plaintiffs fail to establish a likelihood of success on the merits of any of their claims, the Court need not consider whether the requested relief is properly framed as a mandatory preliminary injunction, as the government contends, or a prohibitory permanent injunction. *See Monserrate*, 599 F.3d at 154 n. 3 (citing *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 89 (2d Cir.2006)).

*Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Irreparable harm is injury for which a monetary award cannot be adequate compensation." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996). "To satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir.2007) (internal quotation marks omitted).

▮ The Moores assert irreparable harm based on impending aesthetic injury. They travel regularly to North Piceance to experience the wild horses. If the gather is successful, all of the horses in North Piceance will be removed. The BLM counters that hundreds of wild horses will remain on the adjacent land in Piceance East and can satisfy Plaintiffs' aesthetic interests.

Courts to consider the issuance of a preliminary injunction prior to a gather under the Wild Horses Act have found irreparable harm lacking. *See In Def. of Animals v. U.S. Dep't of the Interior*, 737 F.Supp.2d 1125, 1138–39, 2010 WL 3128396, at *10 (E.D. Cal. Aug. 9, 2010); *In Def. of Animals v. Salazar*, 675 F.Supp.2d 89, 102–03 (D.D.C.2009). However, in each of those cases, the proposed gather would remove some—but not all—of the horses on the land at issue. *In Def. of Animals v. U.S. Dep't of the Interior*, 737 F.Supp.2d at 1130–31, 2010 WL 3128396, at *2 (proposed gather would reduce the number of horses from 1,855 to between 448 and 758); *In Def. of Animals v. Salazar*, 675 F.Supp.2d at 92 (proposed gather would reduce the number of horses from 3,040 to between 572 and 952). Thus, because "animals [would] still be present after the gather," there was no irreparable harm because there is no "enforceable right to observe a particular number of animals." *In Def. of Animals v. U.S. Dep't of the Interior*, 737 F.Supp.2d at 1138, 2010 WL 3128396, at *10.

Cases involving other animals have similarly found the presence of animals on the land after the allegedly unlawful action to weigh strongly against irreparable harm. *See Fund for Animals v. Mainella*, 294 F.Supp.2d 46, 58 (D.D.C.2003) (no irreparable harm where a planned six-day black bear hunt was "not designed to eradicate or even significantly reduce the black bear population"); *Fund for Animals v. Babbitt*, 2 F.Supp.2d 562, 566 (D.Vt.1996) (no irreparable harm where "plaintiffs . . . presented virtually no concrete evidence to support their contention that their ability to view or photograph moose will be impaired as a result of the proposed limited hunt. . . . In fact, the state's moose population continues to increase each year and . . . the moose hunts . . . only decrease the rate of population growth.").

By contrast, here the BLM seeks to permanently remove all horses from a specific tract of land. The BLM cannot gloss over this distinction by arguing that Plaintiffs can still view horses on neighboring lands. Dr. Moore testified about his longstanding connection to North Piceance. BLM's reliance on *American Horse Protection Association v. Frizzell*, 403 F.Supp. 1206 (D.Nev.1975) is misplaced. In *Frizzell*, the court held that plaintiffs' interests were not negatively affected by the removal of 400 horses when 600 horses remained on the land. *Am. Horse Prot.*, 403 F.Supp. at 1210. In dicta, however, the court noted that "[t]his may have been a different case had plaintiff been able to satisfy the court that the proposed round up would extinguish the wild horse population." *Am. Horse. Prot.*, 403 F.Supp. at 1210. This case presents just such a "dif-

ferent case." The BLM's actions would "extinguish the wild horse population" in the 79,500–acre North Piceance Herd Area. This is sufficient to constitute irreparable harm.

The BLM further argues that Plaintiffs' delay of almost thirty days between the agency's final decision on September 10 and the filing of the Complaint on October 7 undermines any claim of irreparable injury. Delay in seeking preliminary injunctive relief alone can justify denial of a preliminary injunction because "the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir.1985)); *see also Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C.Cir.1976). However, none of the cases relied on by BLM found that a delay of as few as thirty days can negate a finding of irreparable harm. *See Tough Traveler*, 60 F.3d at 968 (delay of nine months negates a presumption of irreparable harm); *Citibank*, 756 F.2d at 276 (delay of nine months after receiving notice in the press, and ten weeks after receiving formal notice, negates a presumption of irreparable harm); *Fund for Animals v. Frizzell*, 530 F.2d at 987 (delay of forty-four days "bolster[s] . . . conclusion that an injunction should not issue"); *see also Cunningham v. English*, 78 S.Ct. 3, 4, 2 L.Ed.2d 13 (1957) ("Many of the allegations in the papers are based on events known by petitioners to have occurred months and years ago."). *Cf. Kadant, Inc. v. Seeley Machine, Inc.*, 244 F.Supp.2d 19, 34 (N.D.N.Y.2003) (delay of four months insufficient to negate a finding of irreparable harm, where such harm was otherwise established).

*Fund for Animals v. Frizzell* provides the closest parallel to this case. Even there, however, the delay of forty-four days was two weeks longer than the delay here. Moreover, *Fund for Animals* was not a case in which irreparable harm would have been found but for the delay in filing for injunctive relief. Rather, irreparable harm would not have been found regardless of the delay, because the plaintiff's claims were based solely on "non specific claims of the destruction and loss of wildlife" and the "extreme contention that the loss of only one bird is sufficient to warrant a preliminary injunction." *Fund for Animals v. Frizzell*, 530 F.2d at 987. Where, as here, Plaintiffs have otherwise established irreparable harm, and the delay in filing falls short of the minimum delay established by case law as capable of negating that finding, this Court declines to hold that the delay undermines Plaintiffs' claims of irreparable injury.

III. *Likelihood of Success on the Merits*

A. *Standard for Review of Final Agency Action*

The APA provides that a reviewing court may overturn only those agency decisions that are " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law,' in excess of the agency's statutory jurisdiction or authority, or 'without observance of procedure required by law.'" *Natural Res. Def. Council v. U.S. Dep't of Agriculture*, 613 F.3d 76, 83 (2d Cir.2010) (quoting 5 U.S.C. § 706(2)(A), (C), (D)). This standard is "particularly deferential." *Envt'l Def. v. U.S. Envt'l Prot. Agency*, 369 F.3d 193, 201 (2d Cir.2004). An agency's action should be set aside under the APA only "if it relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the products of expertise." *Natural Res. Def. Council* 613 F.3d at 83 (quoting *Fund for Animals v. Kempthorne,* 538 F.3d 124, 132 (2d Cir.2008)).

▉ Further, where the action under review involves an agency's interpretation of a statute that the agency is charged with administering, courts apply the two-step framework set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, where "Congress has directly spoken to the precise question at issue" and "the intent of Congress is clear," "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. If, however, "the statute is silent or ambiguous with respect to the specific issue," the court cannot "simply impose its own construction on the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. Rather, the court must defer to the agency interpretation so long as the agency interpretation is "a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

B. *Wild Free–Roaming Horses and Burros Act Claims*

1. *Statutory Framework*

In 1971, Congress enacted the Wild Horses Act "extend[ing] federal protection to wild horses and empower[ing] BLM to manage horses roaming public ranges as part of the Agency's management of the public lands." *Am. Horse Prot. Ass'n v. Watt,* 694 F.2d 1310, 1311–12 (D.C.Cir. 1982). The BLM "manage[s] the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). The Wild Horses Act commands the BLM to "consider [wild horses] in the area

where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331. A "herd area means the geographic area identified as having been used by a herd as its habitat in 1971." 43 C.F.R. § 4700.0–5(d).

To accomplish the statutory mandate to "protect and manage" wild horses on public lands, BLM "may designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation." 16 U.S.C. § 1333(a). These "specific ranges" are referred to as "herd management areas," which the BLM must establish in accord with approved land use plans and designate "for the maintenance of wild horse" herds. 43 C.F.R. §§ 4710.1, 4710.3–1. Responsibility for a particular herd management area rests with the BLM's local field offices. *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,* 460 F.3d 13, 16 (D.C.Cir.2006).

▉ "In each herd management area, the [BLM] determines an 'appropriate management level' ('AML') for the wild horse and burro populations." *Fund for Animals,* 460 F.3d at 16 (citing 16 U.S.C. § 1333(b)(1)). Local BLM offices have "significant discretion to determine their own methods of computing AML for the herds they manage." *Fund for Animals,* 460 F.3d at 16.

Because the Wild Horses Act resulted in overpopulation of wild horses, Congress amended it in 1978 through the Public Rangelands Improvement Act, which struck "a new balance between 'protecting wild horses and competing interests in the resources of the public range.'" *Blake v. Babbitt,* 837 F.Supp. 458, 459 (D.D.C.1993). Under the amended statute, the BLM must keep a current inventory of horses on public lands to determine where overpopulation exists. 16 U.S.C. § 1333(a). Section 1333(b)(2) provides:

Where the Secretary determines on the basis of (i) the current inventory of lands within his jurisdiction; (ii) information contained in any land use planning completed pursuant to [43 U.S.C. § 1712]; (iii) information contained in court ordered environmental impact statements as defined in [43 U.S.C. § 1902]; and (iv) such additional information as becomes available ... or *in the absence of the information contained in ("i-iv") above on the basis of all information currently available to him,* that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall *immediately remove excess animals from the range* so as to achieve appropriate management levels.

16 U.S.C. § 1333(b)(2) (emphasis added). The statute specifically provides an "order and priority" for removal "until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation." 16 U.S.C. § 1333(b)(2).

The BLM must fulfill its statutory management obligations "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands" and "with the objective of limiting the animals' distribution to herd areas." 16 U.S.C. § 1333(a); 43 C.F.R. § 4710.4. Further, "[a]ll management activities shall be at the minimal feasible level ... in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species." 16 U.S.C. § 1333(a).

### 2. *Plaintiffs' Claims*

■ Plaintiffs principally challenge the removal of horses from North Piceance, not the herd management area. They argue this removal violates the Wild Horses Act, which they allege requires that herds "should remain on the lands on which they were found" in 1971. (Compl. ¶ 26.) But this mistakes the clear letter of the statute under the first step of *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778.

The Wild Horses Act requires the BLM to "protect and manage" wild horses "as components of the public lands." 16 U.S.C. § 1333(a). To accomplish this purpose, the horses "are to be *considered* in the area where presently found." 16 U.S.C. § 1331. Nothing in the statute requires the BLM to *maintain* the horses throughout that area. Rather, in managing wild horses in balance with other uses, the statute expressly authorizes the BLM to "designate and maintain *specific ranges* on public lands as sanctuaries for [the horses'] protection and preservation." 16 U.S.C. § 1333. The statute requires only that this range "not exceed" the horses' "known territorial limits." 16 U.S.C. § 1332. Rather, the herd management area is an "amount of land" within those "territorial limits" that is "necessary to sustain an existing herd or herds of wild free-roaming horses." 16 U.S.C. §§ 1332(c), 1333(a).

The record before this Court reflects that the BLM followed this procedure in the White River Resource Area. In 1980, the BLM conducted a "multiple use analysis" as to the White River Resource Area. (*See* Declaration of Amy A. Barcelo dated Oct. 18, 2010 Ex. A: 1980 White River Resource Area Management Framework Plan ("1980 Plan").) After considering the oil and gas activities west of Douglas Creek and finding that the horses' "natural habitat" lay east of Douglas Creek, the BLM determined to maintain the horses "east of Douglas Creek" and remove any horses "west of Douglas Creek." (1980 Plan, Multiple Use Recommendations.) Accordingly, the area east of Douglas Creek, now known as Piceance East, was selected for the management of wild hors-

es within the White River Resource Area in accord with the statute. *See* 16 U.S.C. §§ 1332(c), 1333(a). Those areas west of Douglas Creek were found to be unsuitable for wild horses and are now known as West Douglas and North Piceance, the herd area at issue here. (Walter Decl. ¶ 14.)

As Walter explained at the hearing, this analysis was revisited in the current land use plan in 1997. (Tr. at 73.) After considering the original habitat of the horses, the best forage and water sources, optimal summer and winter ranges, and the balance of other uses, the BLM concluded Piceance East remained appropriate for management of wild horses in the White River Resource Area. (Tr. at 73–75.)

Plaintiffs nevertheless contend that the BLM's ongoing gather of horses outside the designated herd management area contravenes the statute because the agency made no determination that the North Piceance horses are "excess." *See* 16 U.S.C. § 1333(a). It is undisputed that "BLM's removal authority is limited to those wild free-roaming horses and burros that it determines to be 'excess animals' within the meaning of the Wild Horses Act." *Colorado Wild Horse & Burro Coalition v. Salazar,* 639 F.Supp.2d 87, 96 (D.D.C.2009).

However, the record before this Court makes clear that the BLM made just such a determination. The Decision Record expressly sets forth that horses "permanently residing" outside Piceance East, including North Piceance, "are in areas not designated for their long-term use and a thriving natural ecological balance cannot be maintained with other resource use allocations." (Decision Record at 3.) The Decision Record explicitly concluded, "the wild horses outside [Piceance East] are determined to be defined as excess and must be removed." (Decision Record at 3.)

Although Plaintiffs contend that this excess finding was a mere "summary determination" without "any probe" into the multiple-use relationship of the area, examination of the Decision Record reveals that the BLM considered all factors required under the statute to make a determination of excess—(i) a current inventory of lands, (ii) information contained in any land use plan, (iii) information contained in court-ordered environmental impact statements,[2] and (iv) any additional available information. *See* 16 U.S.C. § 1333(b)(2)(i)-(iv). First, the BLM conducted a census of horses in Piceance East and those outside, including in North Piceance. Further, as required under 43 C.F.R. § 4710.1, the BLM acted on the basis of "the most recent approved land use plan," the 1997 Plan, which was accompanied by an environmental impact statement under NEPA and went through notice and comment procedures. (Decision Record at 3.) The 1997 Plan required that, pursuant to the 1980 Plan's designation of the herd management area, all horses located outside Piceance East must be removed after 2007. This Court notes the ongoing gather is the first to occur after that deadline. Accordingly, the BLM complied with the clear mandate of the statute.

In addition to the considerations set forth in section 1333(b)(2), the BLM conducted an Environmental Assessment before approving the gather. Despite Plaintiffs' assertions to the contrary, that study considered the impact of the gather on the wild horses themselves. Indeed, the very first category considered in the Environmental Assessment's cumulative analysis of "Natural, Biological, and Cultural Resources" in entitled "Wild Horses." (EA at 16.) The area of study included Pi-

---

**2.** This third factor is not applicable here.

ceance East "and areas immediately surrounding the areas [sic] *including the North Piceance Herd Area.*" (EA at 34 (emphasis added).)

With respect to the BLM's methods for designating what horses belong to which herd area or herd management area, Plaintiffs provide no law supporting their assertion that the BLM must detail these technical processes in their Decision Record. Notably, NEPA does not require disclosure of such processes in the Environmental Assessment. *See* 40 C.F.R. § 1508.9(b).

While this is a case of first impression in this Circuit, the overarching theme in similar cases in other Circuits is that the judicial system must afford deference to the BLM in fulfilling its obligations to protect wild horses as one of many uses on the public lands. 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands under principles of multiples use and sustained yield . . . ."). As District Judge Lamberth held, even where the BLM's knowledge is "not complete," it is authorized to take action under the amended statute because "the endangered and rapidly deteriorating range cannot wait." *Blake,* 837 F.Supp. at 459 (citing *Am. Horse,* 694 F.2d at 1317–19); *see* 16 U.S.C. § 1333(b)(2) (where the BLM determines "in the absence of the information contained in (i-iv) above on the basis of all information currently available to him, that an overpopulation exists" he "shall immediately remove excess animals"). Against that backdrop, this Court cannot conclude that Plaintiffs have established that the BLM more likely than not acted in an arbitrary or capricious manner, otherwise abused its discretion, or acted contrary to law. *See Natural Res. Def. Council,* 613 F.3d at 83. Accordingly, Plaintiffs have failed to demonstrate a likelihood of success on the merits of their Wild Horse Act claims.

## C. *NEPA Claims*

NEPA requires federal agencies to make "high quality" "environmental information . . . available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). Under NEPA, a federal agency must prepare an environmental impact statement ("EIS") before taking any major action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

An agency may prepare an environmental assessment ("EA") to determine whether proposed action significantly affects the quality of the human environment such that an EIS must be completed. 40 C.F.R. § 1501.4. If, after a "hard look" at a proposed action, the agency finds on the basis of the EA that no EIS is required, it must prepare a finding of no significant impact ("FONSI"). 40 C.F.R. § 1501.4(e). An EA is a "concise public document" that "[b]riefly provides sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9(a). An EA must "include brief discussions of the need for the proposal, of alternatives . . . , of the environmental impacts of the proposed action, and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

"NEPA is a procedural statute that mandates a process rather than a particular result." *Stewart Park & Reserve Coalition, Inc. v. Slater,* 352 F.3d 545, 557 (2d Cir.2003). The statute "does not command an agency to favor any particular course of action, but rather requires the agency to withhold its decision to proceed with an action until it has taken a 'hard look' at the environmental consequences." *Stewart Park,* 352 F.3d at 557 (citation omitted). In reviewing an agency's environmental analysis under NEPA, courts are restricted to "insur[ing] that the

agency has taken a 'hard look' at environmental consequences." *Sierra Club v. U.S. Army Corps of Eng'rs,* 701 F.2d 1011, 1029 (2d Cir.1983). A court may not " 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' " *Sierra Club,* 701 F.2d at 1011 (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)).

■ Plaintiffs argue that the BLM did not fulfill its NEPA responsibilities by (1) failing to evaluate the impact of eliminating all horses from North Piceance on the human environment, (2) failing to consider the cumulative impact of complete removals from the herd areas, (3) failing to evaluate the effect on observers of emptying North Piceance, and (4) classifying short-term processing of gathered wild horses as excluded from NEPA consideration.

First, Plaintiffs' factual contention that the BLM did not analyze the impact of eliminating all North Piceance horses on the human environment is mistaken. The Environmental Assessment devoted twenty pages to the effects of the gather on wild horses "in the [Piceance East Douglas Herd Management Area] and surrounding areas." (EA at 16–35.)

Nonetheless, Plaintiffs appear to contend that the Environmental Assessment was procedurally defective because it did not consider the effect of removing horses from North Piceance *independently,* but rather considered the environmental impacts to the White River Resource Area collectively. However, the 109–page Environmental Assessment expressly includes North Piceance as among the "surrounding areas" analyzed to determine the environmental impact of the gather (*see, e.g.,* EA at 34), and nothing in NEPA dictates that individual herd areas must be analyzed separately. Further, the White River Resource Area and herd areas within it have historically been considered in single

studies, and Dr. Moore acknowledged that the horses migrate back and forth in bands from Piceance East and North Piceance. (Tr. at 54, 57.) Dr. Moore underscored this point with his observation that "[horses] don't read papers, they don't understand the margins and boundaries that the BLM intends to put on them." (Tr. at 45.) Against that backdrop, this Court cannot find that the BLM's choice of the entire area as the cumulative study area was arbitrary and capricious. *See Natural Res. Defense Council, Inc. v. Fed. Aviation Admin.,* 564 F.3d 549, 560 (2d Cir. 2009) (cumulative impact study area not arbitrary or capricious where agency cited census boundaries and Sector Plan boundaries).

Similarly, Plaintiffs' assertion that the Environmental Assessment did not consider the cumulative impact of complete removals of horses from herd areas lacks a foundation in the record. The Environmental Assessment states:

> Cumulative Impacts [of the gather alternatives] include impacts resulting from previous, current, and future gathers to maintain wild horse populations within the identified AML and continue to maintain thriving natural ecological balance. Over time, as the excess wild horse population is removed, a regulated population is obtained, and wild horses no longer gain access beyond the [Piceance East] boundary. Effects that may result include continued improvement of the range and riparian-wetland condition . . . .

(EA at 34.) This evidences the BLM's consideration of multiple gathers within the White River Resource Area, towards its goal of complete removal of wild horses from areas outside Piceance East.

Next, Plaintiffs are correct that the BLM did not evaluate the effect on observers of removing all horses from North

Piceance. Indeed, the Environmental Assessment did not mention the aesthetic impact of the gather on persons who visit the area to view wild horses. However, this does not render the Environmental Assessment defective. Although all horses are to be removed from North Piceance, horses may still be observed within the greater White River Resource Area in neighboring Piceance East. (*See* Tr. at 57 (concerning North Piceance and Piceance East, "[t]hey are contiguous ... [a]nd when I see one, I see the other").) As such, it is doubtful that the impact on aesthetic interests would "significantly affect" the quality of the human environment and thereby necessitate an EIS. *See River Rd. Alliance, Inc. v. Corps of Eng'rs. of the U.S. Army*, 764 F.2d 445, 451 (7th Cir.1985) ("Aesthetic objections alone will rarely compel the preparation of an environmental impact statement"). Moreover, this Court notes that the BLM conducted an EIS in 1997 in conjunction with the current land use plan, which set forth the BLM's decision to limit all horses in the White River Resource Area to the herd management area after 2007. Therefore, the detailed EIS that Plaintiffs seek as to the removal of horses from North Piceance has already been conducted.

Finally, Plaintiffs' argument regarding the exclusion of short-term holding practices from NEPA consideration is mentioned glancingly in the submissions before this Court, and Plaintiffs cite no case law to support their argument. Plaintiffs have therefore failed to carry their burden to persuade this Court that the BLM's categorical exclusion is, more likely than not, arbitrary, capricious, in excess of its authority, or not in accord with the law. *Natural Res. Def. Council v. U.S. Dep't of Agriculture*, 613 F.3d at 83; *Moore*, 409 F.3d at 510.

Accordingly, Plaintiffs cannot establish a likelihood of success on the merits of their NEPA claims.

### D. *IQA Claim*

The IQA provides that the Director of the Office of Management and Budget ("OMB") shall, "with public and Federal agency involvement," issue guidelines requiring each federal agency to "issue guidelines ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by the agency." Pub. L. 106–554 § 515. The OMB Guidelines define "dissemination" as "agency initiated or sponsored distribution of information to the public." 67 Fed. Reg. at 8460; *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 685 (D.C.Cir.2010). In accord with the IQA, the BLM issued Information Quality Guidelines to ensure the quality of its own disseminations. (*See* Compl. ¶ 39.)

Plaintiffs allege solely that the BLM's Decision Record "relies on information of insufficient quality, objectivity, utility and integrity to meet the standards demanded by the IQA" and "is based on a pattern and practice of intentionally relying on" insufficient information. (Compl. ¶¶ 96–97.) Their moving papers offer no argument in support of their IQA claim. Plaintiffs conclusory allegations would be insufficient to survive a motion to dismiss under *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), much less "establish" that they are "likely to succeed on the merits" of their IQA claim. *Winter*, 129 S.Ct. at 365. Further, courts to consider the issue have found that "[t]here is no private right of action under the IQA." *See, e.g., Salt Inst. v. Thompson*, 345 F.Supp.2d 589, 601 (E.D.Va.2004), *aff'd*, 440 F.3d 156 (4th Cir.2006). Accordingly,

Plaintiffs fail to demonstrate a likelihood of success on the merits on their IQA claim.

### E. *FLPMA Claims*

The FLPMA governs the BLM's management of the federal public lands and requires the BLM to develop land use plans for the public lands under its control. 43 U.S.C. § 1712(a). The statute directs that in developing and revising land use plans, the BLM must "use and observe the principles of multiples use and sustained yield set forth in this and other applicable law." 43 U.S.C. § 1712(c)(1). Further, all resource management decisions made by the BLM "shall conform to the approved plan," either by being "specifically provided for in the plan, or if not specifically mentioned, [ ] clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment. 43 C.F.R. §§ 1601.0–5(b), 1610.5–3(a).

Despite Plaintiffs' assertion that the BLM failed to consider wild horses as one of multiple uses under the FLPMA, the Environmental Assessment devoted significant analysis to use by wild horses, including those in North Piceance, in the BLM's cumulative analysis of "Natural, Biological, and Cultural Resources." (EA at 16.) While the Complaint further alleges that the Decision Record violates the FLPMA in considering the land use plans in place, the BLM is required by statute to conform to those plans. 43 C.F.R. §§ 1601.0–5(b), 1610.5–3(a).

To the extent that Plaintiffs contend the 1997 land use plan contains outdated information, the FLPMA simply requires the BLM to "develop, maintain, and, *when appropriate,* revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712. Because the statute does not require the BLM to issue land use plans at any specific interval, the court must defer to the agency's interpretation if it is "a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. As Walter testified at the hearing, the BLM's "planning horizon" for a resource management plan is "15 to 20 years," which the BLM follows "unless there [are] extenuating circumstances, major changes in resource uses, changes in other uses or new information." (Tr. at 70.) Walter explained that development of the plan is a "very rigorous process involving collaboration and coordination with not only members of the public, but all other local, state, and Federal Governments and their laws, rules, and regulations and public land users." (Tr. at 86–87.) Walter further testified that although the land use is plan is amended when resource changes occur, "[n]o new information has come forth" to alter the BLM's plan for North Piceance. (Tr. at 77, 87.) Because the statutory language clearly confers discretion on BLM and does not require a specific time frame for updating the land use plan, this Court cannot find the BLM's interpretation to be an impermissible one. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

Accordingly, Plaintiffs have failed to establish a likelihood of success on the merits of their FLPMA claim.

### IV. *Balance of Hardships*

The balance of hardships favors denial of the preliminary injunction. Plaintiffs argue that because "environmental injury can seldom be adequately remedied by money damages and is often permanent or at least of long duration . . ., if such injury is sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). However, Plaintiffs' injury is not so much "environmental"

as it is aesthetic. (*See* Dr. Moore Decl. ¶ 3 ("Seeing [the horses] in their natural surroundings and running free is essential to the aesthetic enjoyment of [my] trips [to North Piceance and Piceance East]."); Moore Decl. ¶ 4 ("It would be impossible to replace the cultural and historical significance [the horses] add to the landscape.").)

Further, the evidence shows that the real risk of environmental injury is in *postponing* or undoing the gather. The BLM is required to manage public lands for multiple uses, including scientific, historical, ecological, environmental, and hydrological, not solely to maintain the vitality of wild horse populations. 43 U.S.C. § 1702(c). The BLM must manage public lands "so that they are utilized in the combination that will best meet the present and future needs of the American people." 43 U.S.C. § 1702(c). Following this mandate, BLM found, pursuant to the White River Resource Area Management Framework Plan, that "it could not maintain a thriving ecological balance and multiple use relationship outside of [Piceance East]" and therefore "selected [Piceance East] as the area most suitable for management of wild horses." (Walter Decl. ¶ 14.)

Moreover, granting a preliminary injunction at this stage would result in the postponement of any gather until at least July 2011. This is because gathers cannot occur during the winter or the spring foaling season. (Tr. at 78.) Further, only two contractors are capable of conducting a helicopter-trapping gather. (Walter Decl. ¶¶ 26, 30.) Vegetation in North Piceance is sparse and slow-growing, and therefore "the ecosystem on the range can deteriorate quickly if there are too many animals." (Walter Decl. ¶ 15.) If the gather is delayed until next year, the wild horse population in North Piceance will increase by 20%, "exacerbating deteriorating resource conditions even further and resulting in a substantial increase in BLM's gather cost." (Walter Decl. ¶ 31.)

In addition, further delay would cause harm to the BLM. More than forty BLM and independent contractor personnel are involved in the gather, and the total cost of the operation is approximately $500,000. A stay would result in additional costs and would make it impossible to complete the gather this year because of work schedules and the onset of winter weather in the 6,000–foot elevation of North Piceance. (Walter Decl. ¶ 28.) Moreover, if the gather occurs next year, the BLM would need to remove more horses due to population growth, with a concomitant increase in time and labor costs. (Walter Decl. ¶ 29.)

Against these harms to the BLM and the environment, Plaintiffs assert the aesthetic harm of no longer being able to view wild horses in North Piceance. As of yesterday's hearing, the BLM had gathered three horses off of public lands in North Piceance.[3] The aesthetic harm caused by their absence does not outweigh the considerable harm to the BLM if the gather is stopped or undone. Although the absence of horses in North Piceance inflicts an aesthetic injury, Plaintiffs can view wild horses in Piceance East, the adjacent herd management area with minimal—if any—additional effort. (Tr. at 56–57.) Accordingly, the balance of hardships weighs in favor of denying the preliminary injunction.

## V. *Public Interest*

██ The public interest likewise weighs in favor of denying a preliminary

---

**3.** Although the BLM has also gathered eight horses from private lands within North Piceance, Plaintiffs concede that the BLM is obliged to remove wild horses from private lands and cannot return them. Accordingly, those horses are not at issue in this action.

injunction. The public interest is served by implementing the well-considered decision of the BLM that the presence of horses in North Piceance is contrary to multiple use considerations and detrimental to the area's overall environment. Moreover, this is not a situation in which the plaintiff has demonstrated a likelihood of success on the merits, thereby implicating the public's interest in the "meticulous compliance with the law by public officials." *Fund for Animals v. Clark*, 27 F.Supp.2d 8, 15 (D.D.C.1998). Under the 1997 land use plan, the BLM was required to remove all horses from North Piceance after 2007. Having determined that the North Piceance horses are in excess of the AML, the BLM is legally required to conduct the gather. *See In Def. of Animals v. U.S. Dep't of the Interior*, 737 F.Supp.2d at 1139–40, 2010 WL 3128396, at \*11; *In Def. of Animals v. Salazar*, 675 F.Supp.2d at 98.

## CONCLUSION

This application for a preliminary injunction has presented many novel issues for an urban court. In recognition of the parties' need for a resolution of this application before any wild horses are transported to Canon City, Colorado, the application of Plaintiffs Habitat for Horses, American Society for the Prevention of Cruelty to Animals, The Cloud Foundation, Toni Moore, and Dr. Don Moore for a preliminary injunction is denied.

SO ORDERED.